OPINION
SMITH, Chief Judge.
Respondent-Petitioner New Vista Nursing and Rehabilitation, LLC (“New Vista”), contends that the licensed practical nurses (“LPNs”) employed at its nursing home could not unionize because they were “supervisors.” The LPNs are supervisors, New Vista argues, because they have the “authority” to “discipline other employees[ ] ... or effectively to recommend such action.” 29 U.S.C. § 152(11). New Vista explains that the LPNs had such authority because, their duties included filling out forms known as “Employee Warning Notices” or “Notices of Corrective Action,” which-recommended discipline for certified nursing assistants (“CNAs”).
After New Vista refused to bargain with the LPNs’ union, the National Labor Relations Board (the “Board”) held that New Vista’s refusal to bargain was unlawful because, among other things, the nurses did not have the authority to effectively recommend discipline. To determine whether the LPNs had such authority, the Board applied a four-part test squarely at odds. with our controlling precedent—specifically NLRB v. Attleboro Associates, Ltd., 176 F.3d 154 (3d Cir. 1999). Therefore, we will deny the Board’s petition for enforcement and grant New Vista’s cross-petitions for review. In doing so, we will remand this case to the Board to allow it to determine whether the1 LPNs have the authority to effectively recommend discipline under At-tleboro.
Before we can move to the analysis by which the Board should determine whether the LPNs are statutory supervisors, we will first address the sundry procedural arguments advanced by New Vista. After the Supreme Court’s decision in NLRB v. Noel Canning, — U.S. -, 134 S.Ct. 2550, 189 L.Ed.2d 538 (2014), and our post-Noel Canning remand to the Board to clear up procedural and jurisdictional issues, we conclüde that New Vista’s procedural arguments are meritless.'
BACKGROUND
There are three levels of nursing staff at the New Vista home who .are supervised by the Director of Nursing: (1) the “nursing supervisor” during the evening shift or “unit manager” during the.morning shift; (2) LPNs[1]; and (3) “Certified Nurse *117 Aides” also known as “certified • nursing assistants” or “CNAs.” See New Vista Nursing & Rehab,, LLC, 357 N.L.R.B. 714, 715 (2011); JA0073-75; JA0079; JA0881. In January 2011,1199 SEIU United Healthcare Workers East (the “Union”) filed a petition to represent the LPNs.[2]
The Board approved the bargaining Unit and required that an election be held to determine whether the Union would serve as the LPNs’ bargaining representative. JA0848-50, 0878-79. The bargaining unit was defined to include “[a]ll full-time and regular part-time Licensed Practical Nurses employed by the Employer at its Newark, New Jersey facility, excluding all other employees, guards, and supervisors as defined by the Act.” JA0849-50.
One of New Vista’s main objections to the bargaining unit was that the LPNs were supervisors under 29 U.S.C. § 152(11) because they have the “authority” .to “discipline other employees[ ] ... or effectively to recommend such action.” If they were supervisors, the LPNs would not have a statutory right to be represented in collective bargaining. See 29 U.S.C. § 152(3) (“The term ‘employee’ ... shall not include ... any individual employed as a supervisor....”); see also NLRB v. Ky. River Cmty. Care, Inc., 532 U.S. 706, 718, 121 S.Ct. 1861, 149 L.Ed.2d 939 (2001) (“The Labor Management Relations Act, 1947 (Taft-Hartley Act) expressly excluded ‘supervisors’ from the definition of ‘employees’ and- thereby from the protections of the Act.”). To determine whether an individual is a supervisor, the Supreme Court has provided a three-part test:
Employees are statutory supervisors if (1) they hold the authority to engage in any 1 of the 12 listed supervisory functions [in 29 U.S.C. § 152(11)], (2) their “exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment,” and (3) their authority is held “in the interest of the employer.”
Ky. River, 532 U.S. at 713, 121 S.Ct. 1861 (quoting NLRB v. Health Care & Ret. Corp. of Am., 511 U.S. 571, 573-74, 114 S.Ct. 1778, 128 L.Ed.2d 586 (1994)). One of the twelve listed supervisory functions is “disciplining] other employees.” 29 U.S.C. §152(11).
New Vista argued that it showed that the LPNs effectively have the power to discipline other employees because LPNs submitted disciplinary forms known as a “Notice of Corrective Action” or “Employee Warning Notice.” E.g., JA0872-73, JA0884-86.
The facts surrounding these forms were fiercely contested. See JA0856-0862. Some testimony suggésted LPNs did not use the forms to effectively recommend discipline. One of the nurses had never seen the Employed Warning Notice until just prior to her testimony. Sée' JA0276; see also JA0329. Similarly, testimony by another nurse was that LPNs rarely (if ever) recommended a specific kind of discipline. See JA0330.
There was, however, countervailing evidence that supported New Vista’s position. Most notably, Director of Nursing Victoria Alfeche testified that LPNs, in the exercise of their own discretion, frequently filled out these forms. Further, Alfeche explained that LPNs could recommend a specific type of discipline and-that she acted on the forms as a matter of course. See JA0098-99, 0148.
In his March 9, -2011 order, NLRB Regional Director J. Michael Lightner rejected New Vista’s argument, applying a four-part test based on a vacated NLRB opinion: “To prevail, the Employer must prove *118 that: (a) LPNs submit actual recommendations, and not merely anecdotal reports, (b) their recommendations are followed on a regular basis, (c) the triggering disciplinary incidents are not independently investigated by superiors, and (d) the recommendations result from the LPNs’ own independent judgment.” JA873 (citing ITT Lighting Fixtures, 265 N.L.R.B. 1480, 1481 (1982), vacated on other grounds sub nom. ITT Lighting Fixtures, Div. of ITT Corp. v. NLRB, 712 F.2d 40 (2d Cir. 1983)). Director Lightner’s conclusion rested heavily on his finding that LPNs “simply report[ed] factual findings to their superiors without any specific recommendation for disciplinary action” and that the “higher authorities” at New Vista proceeded with independent investigations upon receiving the forms. See JA0873-74. Director Lightner also noted that there were very few examples in the record of LPNs who filled out the forms other than Grace Tumamak. See JA0875. Director Lightner further found that forms filled out by Ms. Tumamak could not show the authority of other LPNs because Ms. Tumamak served as the unit manager on one shift and as an LPN on another. See JA0850.
The election to determine whether the Union would serve as the LPNs’ bargaining representative was held on April 8, 2011. See JA0039. A majority of LPNs voted to be represented by the Union by a vote of 26 to 7. See id. Four additional votes were challenged. See id.
That same day, the Board denied New Vista’s request for review of Director Lightner’s order that directed the election would occur. See JA0911, available at http://apps.nlrb.gov/link/document.aspx/ 09031d45804718e4.
Because such denials are nonreviewable, New Vista pursued the standard course of testing the Union’s certification by refusing to bargain. See NLRB v. FedEx Freight, Inc., 832 F.3d 432, 435 n.1 (3d Cir. 2016); JA0021; JA0042 (“Dear All; We are testing the certification and will not be bargaining.”). New Vista asserted that the LPNs were statutory supervisors and, even if they had not been prior to the certification, they were as of March 25, 2011, because of a change in the LPNs’ duties. See JA0049, 0053.
In a decision and order dated August 26, 2011, the Board (Liebman, Becker, Hayes)[3] unanimously granted summary judgment in favor of the Union and against New Vista. See New Vista Nursing & Rehab., LLC, 357 N.L.R.B. 714.
The Board’s order granting summary judgment on the refusal to bargain charge and many of its subsequent orders denying New Vista’s motions for reconsideration took place during what may fairly be described as unusual times for the Board. The political branches had not filled many of the vacancies on the Board. This led then-President Obama to make a series of recess appointments to fill the vacancies. See NLRB v. Noel Canning, — U.S. -, 134 S.Ct. 2550, 2557-58, 189 L.Ed.2d 538 (2014) (describing the recess appointments); id. at 2557 (“As of January 2012, Flynn’s nomination had been pending in the Senate awaiting confirmation for approximately a year.”). As is relevant here, there were two different sets of recess appointments: (1) Craig Becker was recess *119 appointed to the Board in 2010, and (2) Sharon Block, Terence Flynn, and Robert Griffin were all recess appointed in 2012. See NLRB v. New Vista Nursing & Rehab., 719 F.3d 203, 213 (3d Cir. 2013), abrogated by Noel Canning, — U.S. -, 134 S.Ct. 2550, 189 L.Ed.2d 538; id. at 244-45 (Greenaway, Jr., J., dissenting).
As described below, if there are an insufficient number of Board Members, the Board will be unable to muster a quorum. Without a quorum, the Board cannot issue legally enforceable orders. The National Labor Relations Act (“NLRA”) provides that the Board shall have five members. 29 U.S.C. § 153(a). As the Supreme Court has held, there are three Board quorums, of which the first and third must exist for any given NLRB decision to be valid under 29 U.S.C. § 153(b). See generally New Process Steel, L.P. v. NLRB, 560 U.S. 674, 130 S.Ct. 2635, 177 L.Ed.2d 162 (2010). First, three members of the Board constitute a quorum of the entire Board. See 29 U.S.C. § 153(b) (“[T]hree members of the Board shall, at all times, constitute a quorum of the Board.... ”); New Process Steel, 560 U.S. at 680, 130 S.Ct. 2635 (“Interpreting the statute to require the Board’s powers to be vested at all times in a group of at least three members is consonant with the Board quorum requirement, which requires three participating members ‘at all times’ for the Board to act.” (quoting 29 U.S.C. § 153(b))). Second, the Board may delegate its power to a three-member group. See 29 U.S.C. § 153(b) (“The Board is authorized to delegate to any group of three or more members any or all of the powers which it may itself exercise.”); New Process Steel, 560 U.S. at 679, 130 S.Ct. 2635 (“The first sentence of § 3(b), which we will call the delegation clause, provides that the Board may delegate its powers only to a ‘group of three or more members.’ ” (quoting Labor Management Relations Act, 1947, § 3(b), Pub. L. No. 80-101, 61 Stat. 136,139 (codified as amended at 29 U.S.C. § 153(b)))). Third, two members of any three-member group constitute a quorum of a three-member group. See 29 U.S.C. § 153(b) (“[T]wo members shall constitute a quorum of any group designated pursuant to the first sentence hereof.”); New Process Steel, 560 U.S. at 681, 130 S.Ct. 2635 (“[T]he group quorum provision, which still operates to authorize a three-member delegee group to issue a decision with only two members participating, so long as the delegee group was properly constituted.”). The two-member quorum of a three-member group ceases to exist as a viable quorum when the Board has fewer than two members. See New Process Steel, 560 U.S. at 679, 130 S.Ct. 2635.
On September 7, 2011, New Vista began filing the first of what would ultimately be five motions for reconsideration, arguing that the Board acted ultra vires because it had too few Members either serving or involved in a particular decision.
In its First Motion for Reconsideration, New Vista argued that the August 26, 2011 order was ultra vires because it was posted on the Board’s website after the expiration of the term of one of its signing members—then-Chairman Wilma Liebman. According to New Vista, if Chairman Lieb-man had not legally participated in the August 26, 2011 order, the delegee group only consisted of two members in violation of 29 U.S.C. § 153(b). See JA0051. New Vista also argued it was entitled to a hearing to investigate changed circumstances in the LPNs’ authority to supervise, pursuant to Frito-Lay, Inc., 177 N.L.R.B. 820 (1969).
On September 13, 2011, the Board filed an application for enforcement of its August 26, 2011 order with this Court. See JA0001.
*120 On December 30,2011, the Board (Becker, Hayes) denied New Vista’s First Motion for Reconsideration. As to Chairman Liebman, the Board explained that the August 26, 2011 order was made final prior' to the August 27 end of Chairman Lieb-man’s term and that the Board’s subsequent acts with regard to the August 26, 2011 order were ministerial. See JA0012-14. With regard to the Frito-Lay argument, the Board rejected it “[f]or the reasons set forth in the Board’s August 26, 2011 Decision and Order,” JA0014.
On January'3, 2012, New Vista filed its Second Motion for Reconsideration. The Second Motion argued that the December 30, 2011 order denying the First Motion for Reconsideration was not decided by a “proper quorum” because one of the three members of the panel, Chairman Pearce, had recused. See JA0055-57.' Because the panel consisted only of Members Becker and Hayes, it was, according to New Vista, improperly constituted.
On January 9, 2012, New Vista filed a petition for review of the December 30 order with this Court. See JA0002-03. We have treated this petition as a cross-petition for review opposing the Board’s petition for enforcement of the August 26, 2011 order.
On March 14, 2012, New Vista filed its Third Motion for Reconsideration. New Vista argued that the Board’s December 30, 2011 order denying the First Motion for Reconsideration was ultra vires because Member Becker’s recess appointment ended on December 17, 2011.' According to New Vista, the Board (Becker, Hayes) lacked a two-person quorum to issue its December 30, 2011 order. See JA0058-59.
On March 15, 2012, the Board (Hayes, Griffin, Block) denied New Vista’s- Second Motion for Reconsideration. The Board held that there was a quorum for the December 30, < 2011 order denying the First Motion for Reconsideration. Specifically, the March 15; 2012 order relied on the fact that, pursuant to New Process Steel, a two-member quorum of a panel can issue‘legally enforceable orders! See JA0015-16. The March 15, 2012 order quoted from the December 30, 2011 order showing that Pearce engaged in the delegation of power to the two-member quorum and then recused. See JA0016 (“Chairman Pearce, who is recused and did not participate in the underlying decision, is a member of the present panel but did not participate in deciding the merits of this proceeding;”).
On March 22, 2012, New Vista filed its Fourth Motion for Reconsideration, arguing that Members Griffin and Block were not Board members on March 15, 2012 because they had been illegally appointed during an intrasession recess. See JA60-61. New Vista again argued that the December 30, 2011 order was improper because Becker was no longer a Board member on December 30,2011. See id.
On March 27, 2012, the Board (Hayes, Griffin, Block) denied the Third and Fourth Motions for Reconsideration. See JA0017-18. The Board stated that the Board properly delegated its authority to a three-member panel and would “not entertain any further motions for reconsiderar tion challenging the authority of the Board in this mattér.” Id.
On April 5, 2012, New Vista filed a petition for review of the March 15 and March 27 - orders. See JA0004-06. We granted New Vista’s request that this petition be consolidated with New Vista’s earlier petition for review for all purposes. These consolidated petitions for review are collectively treated as a-cross-petition opposing the Board’s petition for enforcement of the August 26, 2011 order.
*121 On May 16, 2013, we ruled on the Board’s petition and New Vista’s cross-petitions, holding that the “delegee group acted without power and lacked jurisdiction” when it issued the August 26, 2011 order because Becker’s recess appointment was invalid. New Vista, 719 F.3d at 221, 244. Specifically, we held that recess appointments were legal only when made during Congress’s “intersession breaks.” Id. at 208.
Shortly thereafter, the Board filed a petition for rehearing en banc. On July 16, 2013, we stayed further consideration of New Vista pending the Supreme Court’s resolution of Noel Canning v. NLRB, 705 F.3d 490 (D.C. Cir. 2013), which also addressed the legality of recess appointments to the Board. See Order, No. 12-1027 (3d Cir. filed July 15,2013).
On June 26, 2014, the Supreme Court issued its decision in Noel Canning. — U.S. -, 134 S.Ct. 2550, 189 L.Ed.2d 538. The Supreme Court held that, as used in the Appointments Clause, “the phrase ‘the recess’ ” is not limited to recesses between congressional sessions. Id, at 2561. Recess appointments could be made during an intrasession recess, but such a recess that is “less than 10 days is presumptively too short to fall within the Clause.” Id. at 2567. Further, “proforma sessions” are not “periods of recess,” so no recess appointments could be made during any intrasession recess punctuated by pro forma sessions fewer than ten days apart. Id. at 2574.
Applying those rules, 'the Supreme Court held that Griffin’s and Block’s recess appointments were invalid, When, Griffin and Block received their recess appointments, the Senate had been holding “pro forma sessions • every Tuesday and Friday.” Id. at 2557. Because these pro forma sessions limited the length of the intrasession recess, the resulting 3-day recesses were “too short to trigger the- President’s recess-appointment power.” Id. at 2574.
At the same time, the Supreme Court implied that Member Becker’s appointment was valid because it was made during a two-week intrasession recess.' See id. at 2558 (“The President appointed Member Becker during an intrasession recess that was not punctuated by pro forma sessions, and the vacancy Becker filled had come into existence prior to the recess.”); see also New Vista, 719 F.3d at 213 (“Member Becker ... was appointed on March 27, 2010, one day after the Senate ‘adjourn[ed]’ for two weeks.” (quoting 156 Cong. Rec. S2180 (daily ed. Mar. 26, 2010) (statement of Sen, Kaufman))).
Following the Supreme Court’s Noel Canning decision, we granted the Board’s motion for panel rehearing. In response to this Court’s questions, the Board admitted it “undisputedly lacked a quorum” for its March 15, 2012, and March 27, 2012 orders.[4] Motion of the National Labor Relations Board for Limited Remand of the Administrative Record, No. 11-3440, Doc No. 003112144322'(3d ChvDec. 2, 2015). The Board requested that we remand the administrative record so that it could rule on the motions for reconsideration it denied in March 2012. See id. We granted the motion for remand. See Order, No. 11-3440 (3d Cir. filed Dec. 4, 2015).
*122 On remand, the Board (Miscimarra, Hi-rozawa, McFerran) again denied New Vista’s Second and Third Motions for Reconsideration on the merits and then denied New Vista’s Fourth Motion for Reconsideration as moot. SA14-18.
New Vista then filed a Fifth Motion for Reconsideration, arguing a lack of transparency and that there was no valid quorum to enter the most recent order because Member Hirozawa should have recused himself. Among other things, New Vista claimed that Member Hiroza-wa’s former law firm represented the Union in this case. See SA19-20. On January 5, 2016, the Board denied the Fifth Motion for Reconsideration, with Member Hirozawa denying the request for recusal. .See SA21-26. The Board éxplained that New Vista knew that the Board planned to review the Fourth Motion for Reconsideration “expeditiously.” SA23. As to recusal, the Board referred New Vista to an attached statement by Member Hiro-zawa. See id. Member Hirozawa explained that he did not recuse because, among other things, he had no involvement with “this matter or any other matter concerning” New Vista while in private practice and his first work on this case was more than five years after he left his previous firm. See SA24-26.
Following New Vista’s denial of the Fifth Motion for Reconsideration, we ordered supplemental briefing and requested a supplemental appendix. See Order, No. 11-3440 (3d Cir. filed Jan. 21, 2016). Having received this supplemental material, we now review the Board’s petition for enforcement and New Vista’s cross-petitions for review.
JURISDICTION
We have jurisdiction over the Board’s petition for enforcement pursuant to 29 U.S.C. § 160(e) and jurisdiction over New Vista’s petitions to review the Board’s final order pursuant to 29 U.S.C. § 160(f). See 800 River Rd. Operating Co. LLC v. NLRB, 784 F.3d 902, 906 (3d Cir. 2016).
STANDARD OF REVIEW
“The Board’s legal determinations are subject to plenary review, but we will uphold the Board’s interpretations of the Act if they are reasonable.” MCPc Inc. v. NLRB, 813 F.3d 475, 482 (3d Cir. 2016) (citing Mars Home for Youth v. NLRB, 666 F.3d 850, 853 (3d Cir. 2011)). “[W]e will accept the Board’s factual findings and the reasonable inferences derived from those findings if they are ‘supported by substantial evidence on the record considered as a whole.’” Advanced Disposal Servs. E., Inc. v. NLRB, 820 F.3d 592, 606 (3d Cir. 2016) (quoting 29 U.S.C. § 160(f)). Where the Board has adopted the Regional Director’s findings, we perform our substantial evidence review of the Regional Director’s findings. See MCPc, 813 F.3d at 482.
We review a Board member’s decision whether to recuse under an abuse-of-discretion standard, reversing only when a decision is “arbitrary or unreasonable.” 1621 Route 22 W. Operating Co., LLC v. NLRB, 825 F.3d 128, 143-44 (3d Cir. 2016).
DISCUSSION
To put it mildly, motions for reconsideration have .piled up in this case. The following table shows the tangled nature of the five motions for reconsideration:
Orders and Motions under Consideration
*123 [[Image here]]
We will address the motions for reconsideration in reverse chronological order. In resolving all of these motions, as we do, in favor of the Board, we conclude that we must remand so that the Board may apply an appropriate test to determine whether the LPNs have the authority to discipline other employees.
I. THE FIFTH MOTION FOR RECONSIDERATION (RESOLVED IN THE BOARD’S JANUARY 5, 2016 ORDER)
New Vista’s Fifth Motion for Reconsideration alleged that the Board’s December 17, 2015 order was invalid because (1) New Vista did “not even know the Board was considering the matter”—in its brief, New Vista frames this as a “lack of transparency,” New Vista Supp. Br. 5[5]— and (2) Member Hirozawa should have re-cused. See SA19. Both arguments fail.
First, with regard to the Board’s “transparency,” New Vista now argues that there were two failures: (a) the Board acted with “great alacrity” in resolving the Fourth Motion for Reconsideration in its January 5, 2016 order, New Vista Supp. Br. 1-2, and (b) the Board engaged in unlawful ex parte communication with its general counsel prior to resolving the Fourth Motion for Reconsideration, see New Vista Supp. Br. 2-5. The first argument does not present any legal deficiency and we do not have jurisdiction to address the second because it was not presented to the Board. If we had jurisdiction, we would find this argument unavailing.
With regard to the Board’s “alacrity” in resolving the Fourth Motion for Reconsideration or failure to tell New Vista that it would soon be resolving the Fifth Motion for Reconsideration, New Vista fails to present any factual or legal basis for overturning the January 5, 2016 order. First, New Vista provides no legal hook on which *124 to hang its grievance. And with regard to the facts, there is substantial evidence to support a finding that New Vista knew that the Board planned to act expeditiously. The Board had previously advised this Court it would resolve New Vista’s outstanding motions within thirty days. See SA4. Accordingly, the Board is entitled to the benefit of the presumption of regularity. See Kamara v. Att’y Gen., 420 F.3d 202, 212 (3d Cir. 2005).
With regard to the ex parte communications argument, we lack jurisdiction to consider this argument because New Vista failed to raise this argument before the Board. See 29 U.S.C. § 160(e) (“No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances.”); FedEx Freight, 832 F.3d at 437 (“The crucial question in a section 160(e) analysis is whether the Board received adequate notice of the basis for the objection.” (internal quotation marks omitted) (quoting FedEx Freight, Inc. v. NLRB, 816 F.3d 515, 521 (8th Cir. 2016))); id. at 448 (“[T]he Court of Appeals lacks jurisdiction to review objections that were not urged before the Board.... ” (quoting Woelke & Romero Framing, Inc. v. NLRB, 456 U.S. 645, 666, 102 S.Ct. 2071, 72 L.Ed.2d 398 (1982))). New Vista only argued in its motion (arid the Board only addressed in its order) that the Board ruled too expeditiously and without notice. See SA19; SA23 (addressing only New Vista’s contentions that it was unaware that its reconsideration motion was being considered and that the Board ruled on the reconsideration motion too quickly).
Were we to reach New Vista’s ex parte communication argument, we would rule for the Board. The Board’s General Counsel alternates between two dramatically different roles in a labor litigation, depending on whether it is prosecuting a case before the Board or representing the Board in court. As a result, the General Counsel’s communications are only ex parte when it prosecutes a case—not when it acts as the Board’s counsel in a court proceeding pursuant to a petition for enforcement or petition for review.[6] Here, the allegedly ex parte communications occurred on November 25, 2015, and December 2, 2015. See New Vista Supp. Br. 3. Both communications were made prior to this Court’s remand of the proceeding to the Board on December 4, 2015. Therefore, at the time the General Counsel communicated to the Board, the General Counsel was operating in his capacity as “counsel for the board.” 29 C.F.R. § 102.130(f) (2016). By definition, his communications could not have been ex parte.
Second, New Vista argues that Member Hirozawa should have recused for four reasons: (1) Member Hirozawa worked for Gladstein, Reif & Meginniss, LLP (“Gladstein”), prior to joining the Board, and Gladstein served as counsel for the Union in the instant matter; (2) in his *125 previous position at the Board, Member Hirozawa worked as chief counsel for Chairman Pearce who also worked for Gladstein; (3) Member Hirozawa’s successor as counsel for Chairman Pearce actually represented the Union in this matter; and (4) Member Hirozawa may return to Gladstein. See New Vista Supp. Br. 6-10.
Member Hirozawa did not abuse his discretion by choosing not to recuse. See 1621 Route 22 W. Operating Co., 825 F.3d at 143-44 (“We review an agency member’s decision not to recuse himself from a proceeding under a deferential, abuse of discretion standard.” (quoting Metro. Council of NAACP Branches v. FCC, 46 F.3d 1154, 1164 (D.C. Cir. 1995))).
It was not unreasonable for Member Hirozawa to conclude that he did not' need to recuse because he had not personally represented the Union in this matter and had been away from Gladstein for more than five years before having any* involvement in the instant matter. See SA25; cf. United States v. Dansker, 537 F.2d 40, 53-54 (3d Cir. 1976) (holding that a judge did not need to recuse when the judge previously investigated a company with which the criminal defendants were associated because the criminal defendants’ allegations “merely evidence ‘an impersonal prejudice, (going) to the judge’s background and associations rather than his appraisal of the (movants) personally’”), abrogated on other grounds by Griffin v. United States, 502 (U.S. 46, 57 n.2, 112 S.Ct. 466, 116 L.Ed.2d 371 1991).
New Vista’s.argument that Member Hirozawa should recuse because his successor as chief counsel to Chairman Pearce represented the Union-in this matter and previously worked with Member Hirozawa provides no more reason for Member Hirozawa to recuse than the above-rejected argument that Member Hi-rozawa worked at Gladstein.
Finally; New Vista suggests that Member Hirozawa should recuse because of the possibility that he máy return to Gladstein. See New Vista Supp. Reply 3 (“[H]e could be back at his old, nine member, firm while this case is still sub judice before this court [sic]”). This is rank speculation and it cannot therefore create an appearance of impropriety. See Air Line Pilots Ass’n, Int’l v. U.S. Dep’t of Transp., 899 F.2d 1230, 1232 (D.C. Cir. 1990) (holding that “[t]he political branches of government, so far as we can tell, have never authorized as an ethical requirement” that the Secretary of Transportation be “dis-qualif[ied] from any - matter affecting a client of a prospective employer”).
Because the Board’s speed in resolving the Fourth Motion for Reconsideration was not unlawful and because Member Hirozawa did not abuse his discretion when he decided not to recuse, the Board correctly denied New Vista’s Fifth Motion for Reconsideration.
II. THE SECOND, THIRD, AND FOURTH MOTIONS FOR RECONSIDERATION (THE DECEMBER 17, 2015 ORDER)
A. The Fourth Motion for Reconsideration
In its Fourth Motion for Reconsideration, New Vista argued that, under alternate readings of the Recess Appointments Clause, either (a) Member Becker was not a Member when he joined in the December 30, 2011 order (addressing the Second Motion for Reconsideration) or (b) Members Griffin and Block were not members when-they joined-.in the March 15, 2012 order (addressing the Third Motion for Reconsideration). See JA0061. According to New Vista,- if the Senate “recessed” when, it began .having pro forma sessions, Becker’s recess appointment from the pre *126 vious Session terminated. But, New Vista’s argument goes, if the Senate were not in recess, Griffin and Block could not be appointed. See id.
In its December 17, 2015 order, the Board (Miscimarra, Hirozawa, McFerran) mooted New Vista’s Fourth Motion for Reconsideration by reaffirming the reasoning in its previous orders addressing New Vista’s Second and Third Motions for Reconsideration. See SA17-18. The December 17, 2015 panel was lawfully constituted. Cf. Greater Omaha Packing Co., Inc. v. NLRB, 790 F.3d 816, 825 (8th Cir. 2015) (holding that an argument that an earlier decision was “decided by a panel that lacked a quorum” was not relevant to a particular later decision made by a panel that “was properly constituted”).
B. The Third Motion for Reconsideration
In the Third Motion for Reconsideration, New Vista argued that the December 30, 2011 order was invalid because Member Becker’s recess appointment expired on December 17, 2011 with the recess of the Senate. See JA0058.
Following Noel Canning, other courts have held that Becker’s appointment was valid. We agree. A valid recess appointment lasts until the close of the next Senate session, which, in Becker’s case was January 3, 2012. Therefore, Becker was a duly appointed member of the quorum that decided the December 30,2011 order.
As noted above, Noel Canning held that, because Griffin and Block were appointed during recesses of fewer than ten days, when including pro forma sessions, their appointments were invalid. See Noel Canning, 134 S.Ct. at 2574. Although the Supreme Court did not rule directly on the validity of Becker’s appointment, it noted that the circumstances surrounding his appointment were different from those that made the appointments of Griffin and Block invalid: “The President appointed Member Becker during an intra-session recess that was not punctuated by pro forma sessions, and the vacancy Becker filled had come into existence prior to the recess.” Id. at 2558.
We agree with our sister courts of appeals that have decided this question: Because Becker’s appointment was made in a recess of more than 17 days, Member Becker’s appointment was valid. See Mathew Enter., Inc. v. NLRB, 771 F.3d 812, 814 (D.C. Cir. 2014) (holding that Member Becker’s appointment “was constitutionally valid”); Gestamp S.C., L.L.C. v. NLRB, 769 F.3d 254, 257-58 (4th Cir. 2014) (similar); Teamsters Local Union No. 455 v. NLRB, 765 F.3d 1198, 1201 (10th Cir. 2014) (similar).
Based on Noel Canning, there can be no question that Becker’s appointment lasted through the December 30, 2011 order. A recess appointment does not expire until the end of the next Senate session. See U.S. Const. art. II, § 2, cl. 3 (“The President shall have Power to fill up all Vacancies that may happen during the Recess of the Senate, by granting Commissions which shall expire at the End of their next Session.” (emphasis added)); Noel Canning, 134 S.Ct. at 2565 (contemplating that recess appointments would terminate at the end of the next Senate session).
Because the Senate did not declare an intersession recess, Member Becker’s recess appointment expired on January 3, 2012, when the new congressional session began. See Dodge of Naperville, Inc. v. NLRB, 796 F.3d 31, 41 (D.C. Cir. 2015) (explaining that Member Becker’s tenure ran through noon on January 3, 2012); cf. Noel Canning, 134 S.Ct. at 2558 (“[T]he second session of the 112th Con *127 gress began on January 3, 2012.... ”); NLRB v. Bluefield Hosp. Co., LLC, 821 F.3d 534, 538 (4th Cir. 2016) (“As of January 3, 2012, the terms of three of the Board’s five members had expired.”).
Because Member Becker was acting as a validly appointed Member of the Board when he joined the December 30, 2011 order, the Board correctly denied the Third Motion for Reconsideration.
C. The Second Motion for Reconsideration
In the Second Motion for Reconsideration, New Vista stated that the Board’s December 30, 2011 order was invalid because the third member of the panel, Chairman Pearce, was recused and therefore could not delegate his power to the remaining two members of the Board. See JA055. The Board has stated that Pearce recused after delegating his power. We conclude the delegation was permissible.
On December 30, 2011, when the order was issued, the Board consisted of three members: Pearce, Becker, and Hayes. Pearce determined he had a conflict and therefore could not participate substantively. As noted above, the Board’s organic statute, as interpreted by New Process Steel, allows the Board to delegate its powers to a three-member panel and for two members to constitute a quorum of a three-member panel. See 29 U.S.C. § 153(b); New Process Steel, 560 U.S. at 681, 130 S.Ct. 2635 (“[T]he group quorum provision ... still operates to authorize a three-member delegee group to issue a decision with only two members participating, so long as the delegee group was properly constituted.”). Thus, Becker and Hayes could properly enter the December 30, 2011 order if and only if the Board (Pearce, Becker, Hayes) delegated its power to a three-member panel (Pearce, Becker, Hayes) from which Pearce then re-cused. See D.R. Horton, Inc. v. NLRB, 737 F.3d 344, 353 (5th Cir. 2013) (“[T]wo members of that panel may decide a case ‘if, for example, the third member had to recuse himself from a particular matter.’ ... [T]he Board could validly issue its decision through two of its members, provided that the Board delegated authority to a three-member panel and that such a panel still existed when the two members acted.” (quoting New Process Steel, 560 U.S. at 679, 130 S.Ct. 2635)).
That is what the Board did here. The December 30, 2011 order explained: “Chairman Pearce, who is recused and did not participate in the underlying decision, is a member of the present panel but did not participate in deciding the merits of this proceeding.” JA0012 n.2 (emphasis added).
New Vista challenges the Board’s delegation to a three-member panel of Pearce, Becker, and Hayes on the ground that Pearce had already recused himself from the matter and therefore could not have participated in the delegation of the Board’s power to a three-member panel and could not be considered a member of the three-member panel. See New Vista Rehearing Br. 52 (“Since Chairman Pearce previously recused himself from consideration of the case, he could not participate in the decision to delegate to a panel ... and could not be a member of the panel delegated to determine New Vista’s reconsideration request.” (citation omitted)).[7]
*128 We see no reason to look behind the Board’s statement that Chairman Pearce participated in the delegation and then recused from substantive deliberations. Other courts have approved this proce-' dure. Cf. D.R. Horton, 737 F.3d at 354 (“There is no indication that the Board deviated, from its customary practice of delegating authority to the three-member panel and allowing two members to decide the case when Member Hayes recused.”); Brown v. Trueblue, Inc., No. 1:10-CV-0514, 2012 WL 1268644, at *6 n.7 (M.D. Pa. Apr. 6, 2012) (agreeing that the procedure in D.R. Horton was valid in light of New Process Steel),
With Pearce’s involvement, three members of the Board participated in the delegation of the order denying the First Motion for Reconsideration. As we next discuss, the Board correctly denied the First Motion for Reconsideration.
Ill, THE FIRST MOTION FOR RECONSIDERATION (THE DECEMBER 30, 2011 ORDER)
New Vista’s First Motion for Reconsideration raised two issues with the August 26, 2011 order. First, New Vista argued that the August 26, 2011 order was ultra vires because the term of one of the three Members signing the order—-Chairman Liebman—expired before the order was mailed and posted on the Board’s website. See, e.g., JA0052; New Vista Rehearing Br. 32, 40-48. As we stated in our previous New Vista opinion, Chairman-Liebman was a member of the panel when the order was decided, and later ministerial acts áre irrelevant to the question of the, order’s validity. See New Vista, 719 F.3d at 213-15. Second, New' Vista argued that the Board failed to distinguish Frito-Lay, a past NLRB decision that required a hearing when there were changed circumstances. As the Board has noted in subsequent pases, Frito-Lay applies only when the changed circumstances result from a process begun prior to the representation proceeding before the Board. Here, the Board did hot apply Frito-Lay because it believed the changed circumstances were in response to the Board proceedings. Cf. NLRB v. Sw. Reg’l Council of Carpenters, 826 F.3d 460, 464 (D.C. Cir. 2016) (“[T]he Board need not address ‘every conceivably relevant line of precedent in [its] archives,’ but it must discuss ‘precedent directly on point.’ ” (quoting Lone Mountain Processing, Inc. v. Sec’y of Labor, 709 F.3d 1161, 1164 (3d Cir. 2013))).
First, with regard to 'New Vista’s objection concei’ning Chairman Liebman, we previously answered 'this objection in our 2013 opinion. See New Vista, 719 F.3d at 213-15. Although we vacated our opinion with our August 11, 2014 Order granting rehearing in this case, we reaffirm our earlier reasoning on this issue. We stated then that the Board’s August 26, 2011 order “is entitled to a presumption of regularity.” New Vista, 719 F.3d at 214 (internal quotation mark omitted) (quoting Frisby v. U.S. Dep’t of Hous. & Urban Dev., 755 F.2d 1052, 1055 (3d Cir. 1985)). The .order was dated August 26 and states that Chairman Liebman approved the decision contained therein. See id. The Board’s fail *129 ure to post the order on its website prior to the August 27, 2011 expiration of Chairman Liebman’s term does not rebut the presumption of regularity. See id. at 214-15.[8]"
With regard to Frito-Lay, 177 N.L.R.B. 820 (1969), New Vista first argues that the Board “fail[ed] to hold a hearing on ... changed factual circumstances” as required by that decision. New Vista Rehearing Br. 17-18, 49-51. Later in its brief, however, New Vista concedes that its real objection is that the Board failed to “distinguish” Frito-Lay. New Vista Rehearing Br. 50; see also id. (“This Court requires the NLRB, in order to dispel any appearance of arbitrariness, to- set forth the reasons for not following its prior decisions and the distinctions that compel a different result in order to be enforced.”); New Vista Rehearing Reply 22 (“[T]he NLRB has yet to explain why Frito Lay got a hearing and New Vista did not..., ”).
But the Board’s August 26, 2011 order makes abundantly clear why this is’ not a situation where Frito-Lay 'applies. In Frito-Lay, the relevant changes to the duties of the employees were implemented based on the results of a consulting firm’s study of the employer’s organization that “beg[a]n ... before this proceeding was instituted.” Frito-Lay, Inc., 177 N.L.R.B. 820, 821 (1969). The Board found that the Frito-Lay changes “[were] clearly not for the purpose of avoiding compliance with the Board’s unit finding,” Id.
By contrast with Fritó-Lay, in the August 26, 2011 order, the Board took notice of the Board’s own .allegations, that changes to the LPNs’ duties were made unlawfully to “prevent them from obtaining union representation.” New Vista, 357 N.L.R.B. at 715 n.3.[9] In so doing, the *130 Board cited one of several cases that distinguishes Frito-Lay on these grounds. See id. at 715 n.5 (citing Telemundo de P.R., Inc. v. NLRB, 113 F.3d 270, 279 (1st Cir. 1997)). Indeed, New Vista’s brief acknowledges several cases explaining that a business has to show that the alleged changed circumstances preexisted the representation proceeding, which New Vista failed to do here. See Comar, Inc. 349 N.L.R.B. 342, 359 n.36 (Feb. 2, 2007) (“Frito-Lay is also inapplicable because the invalidation of the unit there was based on a major overhaul of the employer’s national management structure, which the Board found completely eliminated the level of organizational control upon which the unit was premised and was ‘clearly not for the purpose of avoiding compliance with the Board’s unit finding.’ ”); K Mart Corp., 323 N.L.R.B. 583 (1996); see also Telemundo de P.R., 113 F.3d at 278 (“An employer who seeks to overcome that presumption bears a heavy burden of showing that a legitimate business necessity arising out of circumstances that were in play before the representation proceeding concluded forced him to recast job descriptions.”). Because the Board found that the facts here were distinguishable from those in Frito-Lay, there was no need for the Board to invoke Frito-Lay simply to distinguish it.
IV. WHETHER THE LPNs ARE SUPERVISORS (THE AUGUST 26, 2011 ORDER)
Having considered all five of New Vista’s motions for reconsideration, we finally arrive at the merits: whether the LPNs have the effective authority to recommend discipline. In its August 26, 2011 order, the Board applied a test that is incompatible with our caselaw. Specifically, the Board relied on the evidence that management independently investigated the LPNs’ written complaints and that few LPNs apparently submitted written complaints. Our caselaw holds that those are inappropriate factors on which to rely. We will therefore remand for further consideration.
Before discussing how the Board got it wrong, we first set out important legal factors the Board must follow on remand. See MCPc, 813 F.3d at 487 (3d Cir. 2016) (“Because the ALJ and Board’s rejection of these rationales may have stemmed from confusion as to the appropriate analytical framework, we address the choice of test before turning to its application in this case.”).
Whether LPNs in a given nursing home are statutory supervisors is a factbound question about which different circuits have suggested different rules.[10] See NLRB v. Attleboro Assocs., Ltd., 176 F.3d 154, 163 (3d Cir. 1999) (“[Resolution of the question of whether a charge nurse exercises independent judgment is inherently factual in nature, although the cases suggest that similar organizational structures exist throughout the nursing home industry.”); see, e.g., Frenchtown Acquisition Co. v. NLRB, 683 F.3d 298, 308 (6th Cir. *131 2012) (no supervisory status for nurses who, in a progressive disciplinary system, had authority only to “bring [nurses’] aide errors or misconduct to a manager’s attention,” but not to “decide how to proceed” with that information); Schnurmacher Nursing Home v. NLRB, 214 F.3d 260, 265-66 (2d Cir. 2000) (“In actual practice, the CNs appear not to have formally disciplined, CNAs or even, to have recommended discipline, albeit, the CNs ..did, from time to time, refer CNA misconduct to a nurse manager but without recommendation”).
Our last word on the subject was in Attleboro Associates. In Attleboro, we contrasted existing precedent from other circuits and found the Attleboro nurses were supervisors because they had the authority, when confronted with misbehavior, to make a decision to do nothing, “counsel an offending CNA directly, or initiate a progressive disciplinary process that becomes part of a CNA’s permanent personnel file and could lead to' her termination.” Attleboro, 176 F.3d at 165.
Attleboro rejected the Board’s position that an employee does not have authority to effectively recommend discipline if the employee’s supervisors independently investigate the employee’s recommendation. Similar to this case, in Attleboro, the Board argued: “[T]o be supervisory, the actions taken ‘must not only initiate, or be considered in determining future disciplinary action, but also ... must be the basis for later personnel action without independent investigation or review by superiors.’” Br. for the NLRB, Attleboro, 176 F.3d 154, (Nos. 98-6168, 98-6211) (3d Cir. Dec. 7, 1998), 1998 WL 34176828, at *35 (quoting Passavant Health Care Ctr., 284 N.L.R.B. 887, 889 (1987)).
Relying heavily on Glenmark Associates, Inc. v. NLRB, 147 F.3d 333 (4th Cir. 1998), we rejected the Board’s position arid held that the LPNs had the power to effectively supervise the CNAs. See Attleboro, 176 F.3d at 164-66. We noted approvingly that Glenmark “recognized that the NLRA does not preclude a charge nurse from having supervisory status merely because her recommendation is subject-to a superior’s investigation.” Attleboro, 176 F.3d at 164. Thus, we concluded that “an acceptance of the Board’s reading of the NLRA in this case ‘would ... render the statutory phrase “effectively to recommend” nugatory.’” Attleboro, 176 F.3d at 165-66 (quoting Caremore, Inc. v. NLRB, 129 F.3d 365, 370 (6th Cir. 1997)).
In addition to relying on Glenmark, Attleboro distinguished (1) an Eighth Circuit decision arid (2) a District of Columbia Circuit decision that both held that nurses were not statutory supervisors. First, in the Eighth Circuit case, the key fact was that the “nurses’' disciplinary authority consisted ‘solely of the power to verbally reprimand [nursing assistants].’” Attleboro, 176 F.3d at 165 (quoting Beverly Enters. v. NLRB, 148 F.3d 1042, 1046 (8th Cir. 1998)).[11]
Second, in the D.C. Circuit case, “the record did not reveal any instances where a charge nurse exercised th[e] authority” to discipline. Attleboro, 176 F.3d at 165 (emphasis added) (discussing Beverly Enters.-Mass., Inc. v. NLRB, 165 F.3d 960 (D.C. Cir. 1999)). Thus, the D.C. Circuit held that the nurses’ authority was merely *132 “a speculative possibility,, which absent demonstration, is simply ‘paper power.’ ” Beverly Enters.-Mass., 165 F.3d at 964. This was in contrast to Attleboro where the nurses “initiated] a progressive disciplinary process, and their decisions to write up a CNA bec[a]me a permanent part- of the CNA’s personnel file.” Attleboro, 176 F.3d at 165.
Thus, -we held that “because Attleboro’s LPN charge nurses make a decision to counsel an offending CNA directly, or initiate a progressive disciplinary process that becomes part of a CNA’s permanent personnel file and could lead to her termination, the charge nurses effectively recommend discipline using independent judgment within the meaning of section 2(11).” Id, Although Attleboro repeatedly points out that the progressive disciplinary process employed in that case could ultimately lead to termination, it is clear that a nurse can be a statutory supervisor if he or she has the authority to effectively recommend less onerous discipline. For instance in Warner Co. v. NLRB, we held that “sending a[n employee] home is discipline”—-as was “cal[ing] the plant manager’s attention to instances of ... violations of the work rules.” 365 F.2d 435, 439 (3d Cir. 1966). This is also implicit in the statutory text because 29 U.S.C. § 152(11) states, among other things, that a supervisor can “hire, transfer, suspend, lay off, ,.. discharge, ... or discipline other employees.” Were “discipline” the same as “lay[ing] off’ or “discharg[ing],” the word “discipline” would have been mere surplus-age. See Langbord v. U.S. Dep’t of Treasury, 832 F.3d 170, 182 (3d Cir. 2016) (en banc) (“We assume ... that every word in a statute has meaning and avoid interpreting one part of a statute in a manner that renders another part superfluous.” (quoting Disabled in Action of Pa. v. Se. Pa. Transp. Auth., 539 F.3d 199, 210 (3d Cir. 2008))).
Following and citing Attleboro, we further held in another case that the “number of instances” of supervision does not determine whether employees are supervisors. See NLRB v. Prime Energy Ltd. P’ship, 224 F.3d 206, 210 (3d Cir. 2000) (“The mere fact that the regional director found only one instance where a Shift Supervisor sent a Plant Operator home is hardly a reasonable basis to conclude that the authority was lacking. It simply suggests that the authority was rarely needed.”).
Thus, applying Attleboro, we recognize three facts that together may show an employee is a statutory supervisor: (1) the employee has the discretion to take different actions, including verbally counseling the misbehaving employee or taking more formal action, see Attleboro, 176 F.3d at 165 (“Attleboro’s LPN charge nurses make a decision to counsel an offending CNA directly, or initiate a progressive disciplinary process.... ”); (2) the employee’s actions “initiate” the disciplinary process, see id. (“The circumstances clearly are different here inasmuch as Attleboro’s charge nurses initiate' a progressive disciplinary process...;”); and (3) the employee’s action functions like discipline because it increases severity of the consequences of a future rule violation, see id. (“[T]heir decisions to write up a CNA become a permanent part of the CNA’s personnel file and could lead to the CNA’s termination.”).
And, from Attleboro and Prime Energy, we also derive two facts that do not disprove supervisory status: (1) whether a nurse’s supervisor undertakes an independent investigation, see Attleboro, 176 F.3d at 164 (“[T]he ‘relevant consideration is effective recommendation or control rather than final authority.’ ... [T]he NLRA does not preclude a charge nurse from having supervisory status merely because her recommendation is subject to a superi- *133 or’s investigation.” (citations omitted) (describing Glenmark))-, and (2) whether the employees exercise their supervisory authority only a few times (or even, just one time), see Prime Energy Ltd. P’ship, 224 F.3d at 210.
In the case before us, the Board relied on a four-part test that conflicts with the above principles. The Board derived its test from an NLRB opinion (later vacated) to determine whether the nurses here were statutory supervisors: “To prevail, the Employer must prove that: (a) LPNs submit actual recommendations, and not merely anecdotal reports, (b) their recommendations are followed on a regular basis, (c) the triggering disciplinary incidents are not independently investigated by superiors, and (d) the recommendations result from the LPNs’ own independent judgment.” JA873 (citing ITT Lighting Fixtures, 265 N.L.R.B. 1480, 1481 (1982), vacated on other grounds sub nom. ITT Lighting Fixtures, Div. of ITT Corp. v. NLRB, 712 F.2d 40 (2d Cir. 1983)).[12]
Under controlling law, remand is appropriate where, as here, the Board used the wrong legal standard and remand would not be futile. See, e.g., MCPc, 813 F.3d at 482 (“[W]e will remand for further proceedings because the Board failed to apply the correct legal test....”); id. at 490 (“[Wjhether or not we agreed that substantial evidence in the record supported the Board’s ultimate disposition, oiir disagreement with [the] Board’s rationale would prevent us from affirming.”); NLRB v. Alan Motor Lines Inc., 937 F.2d 887, 892 (3d Cir. 1991) (“If we sustained the Board’s decision based on a rationale that *134 the Board might have adopted but did not adopt, we would ‘deprecate the administrative process for [we] would propel the court into the domain which Congress has set aside exclusively for the administrative agency,’ ” (quoting NLRB v. Met. Life Ins. Co., 380 U.S. 438, 444, 85 S.Ct. 1061, 13 L.Ed.2d 951 (1965))). By relying on a vacated NLRB precedent requiring the nurses’ recommendations be implemented without any independent investigation and relying heavily on the fact that the LPNs did not frequently exercise their alleged supervisory power, the Board applied the wrong legal standard.
Nor would a remand be futile. Neither side has shown it is entitled to victory on the present record. On the one hand, the Board’s findings are almost entirely inapt because they are directed to the wrong test. On the other hand, New Vista’s entitlement to victory is unclear.
The Board has failed to show it is entitled to enforcement because Director Lightner’s findings addressed to the wrong test are largely inapplicable to the correct test. See SEC v. Chenery Corp., 318 U.S. 80, 94, 63 S.Ct. 454, 87 L.Ed. 626 (1943) (“The Commission’s action cannot be upheld merely because findings might have been made and considerations disclosed which would justify its order as an appropriate safeguard for the interests protected by the Act. There must be such a responsible finding.”); cf. NLRB v. Local 483, Int'l Ass’n of Bridge, Structural & Ornamental Ironworkers, 672 F.2d 1159, 1165 (3d Cir. 1982) (“If such findings are supported by substantial evidence on the record as a whole, the Board’s remedial order would be enforceable by this court. Such findings have not been made by the Board here.”).
For instance, Director Lightner’s findings go to whether the LPNs’ written notices were independently investigated, whether LPNs ultimately decided the level of discipline, or whether LPNs frequently exercised authority to effectively recommend discipline.[13] As such, they are irrelevant. Indeed, some findings suggest that the nurses may be supervisors under Attleboro. See, e.g., JA0856 (“If a nurse believes that a CNA has violated the Employer’s work rules, the nurse has the discretion to (1) do nothing; (2) verbally counsel the employee without issuing any write-up; or (3) report misconduct to either the nursing supervisor or unit manager.” (emphasis added)). Because the factual findings do not support the necessary legal analysis, we lack the basis to enforce the Board’s decision.
*135 On the other hand, the record does not permit us to conclude that New Vista has proven the nurses are statutory-supervisors. See Ky. River, 532 U.S. at 712, 121 S.Ct. 1861 (“In the unfair labor practice proceeding, therefore, the burden remains on the employer to establish the excepted status of these nurses.”). For instance, it may well be that the notices issued by nurses do not become permanent parts of the CNAs’ files and are not used to increase the severity of the discipline. Indeed, the paucity of disciplinary forms presented suggests that they are not kept in employees’ files. Additionally, we are not unmindful of other circuits’ “reportorial” cases holding that where nurses merely report factual information without actually recommending discipline, the employer fails to show that the nurses have the authority to recommend discipline. See, e.g., Schnurmacher Nursing Home, 214 F.3d at 265-66 (“In actual practice, the CNs appear not to have formally disciplined CNAs or even to have recommended discipline, albeit, the CNs did, from time to time, refer CNA misconduct to a nurse manager but without recommendation.”). Yet, any finding that the nurses here were merely “reportorial” must be reconciled with the demands of Attleboro, See Attleboro, 176 F.3d at 159 (noting that the Board’s “regional Director concluded that the LPN charge nurses merely were serving in a ‘reportorial’ and not supervisory capacity”).[14] While the *136 Board’s finding that the LPNs had discretion in how they handled misbehaving CNAs, a remand would not be futile because the Board could find, for instance, that the LPNs do not “initiate a progressive disciplinary process.” Attleboro, 176 F.3d at 165.
We must remand.
CONCLUSION
For the reasons stated above, we'will vacate the Board’s August 26, 2011 order and remand for the Board to apply the correct legal test on the merits issue,

. Registered nurses or "RNs” interchangeably occupy the same position as the LPNs. See, e.g., New Vista Nursing & Rehab., LLC, Case No. 22-RC-13204 (Mar. 9, 2011) (regional director's decision) (“One nurse (either an RN or an LPN) is assigned to each unit on the floor,.,.”), available at http://apps.nlrb.gov/ Iink/document.aspx/09031d458045c16b, request for review denied (Apr. 8, 2011), available at http://apps.nlrb.g0v/link/document. aspx/09031d45804718e4; JA0074 ("They could be an RN or an LPN.”). We use record citations for Régional Director J. Michael Lightner’s order, JA0848-80; New Vista Nursing & Rehab., LLC, No. 22-RC-13204 (Mar. 9, 2011). A copy of the order and the denial of the request for review can be-accessed at the above URLs.

. The CNAs are already represented by the Union. See, e.g., JA0180.

. Member Pearce recused. See New Vista Nursing & Rehab., LLC, 357 N.L.R.B. 714, 714 n.1 (2011). Throughout this opinion, we frequently note which Board members voted on particular orders. We do so because many of New Vista’s challenges go to whether certain members had already resigned, were illegally appointed, or should have recused from a particular decision—not because the identity of the Board is of significance for any other reason.

. Because the Board undisputedly, lacked a quorum in March 2012, this Court may have lacked jurisdiction over this case had we not remanded because submitting the record creates jurisdiction in this Court, 29 U.S.C. § 160(e) (“Upon the filing of the record with it the jurisdiction of the court shall be exclusive and its judgment and decree shall be final."), and the Board may have lacked the power to submit the record when it did so on March 27, .2012, see NLRB Certified List Transmitted, No, 11-3440 (3d Cir. filed Mar. 27, 2012).

. We cite to the parties’ responsive briefs following the order granting rehearing and filed September 29, 2014 (New Vista), November 25, 2014 (NLRB), and December 9, 2014 (New Vista), as "New Vista Rehearing Br,,” "NLRB Rehearing Br.,” and "New Vista Rehearing Reply,” respectively. We cite to the parties’ responsive briefs following the supplementation and resubmission of the record and filed February 22, 2016 (New Vista), March 23, 2016 (NLRB), and April 6, 2016 (New Vista), as “New Vista Supp. Br.,” "NLRB Supp; Br.,” and "New Vista Supp, Reply,” respectively.

. See 29 C.F.R. § 102.126(a) (2016) ("No in- • terested person outside this agency shall, in an on-the-record proceeding of the types defined in § 102.128, make or knowingly cause to be made any prohibited ex parte communication to Board agents of the categories designated in that section relevant to the merits of the proceeding.”); 29 C.F.R. § 102.127(a) (2016) ("The term person outside this agency, to whom the prohibitions apply, shall include ... the general counsel or his representative when prosecuting an unfair labor practice proceeding before the Board pursuant to section 10(b) of the Act." (emphasis added)); 29 C.F.R. § 102.130 (2016) ("Ex parte communications prohibited by § 102.126 shall not include[ ] ,.. [o]ral or written communications from the general counsel to the Board when the general counsel is acting as counsel for the Board." (emphasis added)).

. Ordinarily, there is no procedural unfairness when a conflicted decisionmaker delegates his or her authority to a neutral deci-sionmaker—indeed, that is what a recusal essentially entails. Cf. In re Grand Jury Subpoena, Judith Miller, 438 F.3d 1141, 1143 (D.C. Cir. 2005) ("As the investigation proceeded, in December of 2003, the Attorney *128 General recused himself from participation and delegated his full authority in the investigation to the Deputy Attorney General as Acting Attorney General.’’); Muffley ex rel. NLRB v. Spartan Mining Co., 570 F.3d 534, 539 (4th Cir. 2009) (“The General Counsel, in turn, recused himself (because of personal ties to the case) and delegated [the Board’s statutory] power in the case at hand to the Deputy- General Counsel.’’); U.S. Office of Government Ethics, OGE Informal Advisory Memorandum 99 X 8, 1999 WL 33308429, at *4 (Apr, 26, 1999) ("Recusal' will mean that someone else must act in the employee's stead concerning any matters that could affect the disqualifying interest,’’).

. In our now-vacated ruling, we cited Braniff Airways, Inc. v. Civil Aeronautics Board, 379 F.2d 453 (D.C. Cir. 1967), for the proposition that ministerial acts that occur after a deci-sionmaker has left power do not deprive the original decision of effect. See New Vista, 719 F.3d at 214. New Vista argues our earlier reasoning is wrong because Braniff Airways states that an order is treated as complete "once all members have voted for ah award and caused it to be issued.” Braniff Airways, 379 F.2d at 459. New Vista then argues that Braniff supports its position because there is neither "substantial evidence” of when Lieb-man " 'voted for’ or 'signed' it and of whether and when she ‘caused it to be issued.’ ” New Vista Rehearing Br. 43, As we explained in our original decision, "the presumption of regularity requires that we consider the date as the record of when the delegee group caused the opinion to be issued, which presupposes that they voted on or before that date.” New Vista, 719 F.3d at 215.
Moreover, any distinction between "voting for” the decision and "causing it to be issued” is irrelevant. For example, if one orders flowers on February 11 and the flowers are delivered on Valentine’s Day, that person has "caused” the flowers to be delivered on February 11, even though there are intermediate steps (credit card processing, packaging, delivery, etc.) between the order and the February 14 delivery.
- New Vista flatly misreads the record when it argues that “the NLRB concedes [A0013] that the Decision and Order were not ‘ready for issuance’ until after August 26, 2011.” New Vista Rehearing Br, 45. In fact, the cited page states: "There is no' dispute that the Board dated the above-referenced Decision and Order August 26, 2011. Consistent with Board practice, the date of the Decision and Order reflects the date, on which all members had voted on the final draft. At that point, the Decision and Order was ready for issuance to the public and service on the parties," JA0013 (emphasis added),

. In response to those allegations, the Board (Hayes, Griffin, Block) ultimately "found that the employer .,, áltered the duties of licensed practical nurses to convert them into statutory supervisors in order to prevent them from obtaining union representation," See New Vista Nursing & Rehab., LLC,- 358 N.L.R.B. 473 (2012). But this finding has likely been nullified by Noel Canning, as acknowledged by the Board, see Colonial Parking, 363 N.L.R.B. No, 90, at 1 n.l (2016), and; in any event, is now *130 pending before this Court, see No. 12-3524. Accordingly, we do not rely on this finding.

. As noted above, there is a three-part test to determine whether an employee is a statutory supervisor: (1) the employee "hold[s] the authority to engage in any 1 of the 12 listed supervisory functions” in 29 U.S.C. § 152(11), (2) the employee’s "exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment,” and (3) the employee’s authority is held "in the interest of the employer,” Ky. River, 532 U.S. at 713, 121 S.Ct. 1861. Here, the issue is whether the nurses held the authority to effectively recommend discipline and whether they used independent judgment.

. Our Attleboro precedent noted that the nurses in the Eighth Circuit case were held not to be “ ‘an integral part of the disciplinary process’ and ‘play[ed] no role in determining whether an employee is disciplined or in determining the type of discipline to be imposed.’ ” Attleboro, 176 F.3d at 165 (quoting Beverly Enters., -148 F.3d at 1046). Here, the Board arguably made those same findings.

. In its brief in this case, the Board argues a rationale more consistent -with Attleboro and other circuits’ caselaw. But the Board should have considered Attleboro and other cases when it made its original ruling—not after filing a petition for enforcement. See Borovsky v. Holder, 612 F.3d 917, 921 ("The Chenery doctrine prevents a court from affirming an agency’s inadequately justified decision ‘by substituting what it considers to be a more adequate or proper basis’ for the decision.” (quoting SEC v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1760, 91 L.Ed. 1995 (1947))); NLRB v. P*I*E Nationwide, Inc., 923 F.2d 506, 518 (7th Cir. 1991) (“The Board’s appellate counsel cannot fill in the holes in the agency’s decision; stated in another manner, it is the Board's order, not its petition for enforcement, that is the subject of our review. Accordingly, we may not accept appellate counsel’s post hoc rationalizations for agency action.” (citations and internal quotation marks omitted)); Henry J, Friendly, Chenery Revisited: Reflections on Reversal and Remand of Administrative Orders, 1969 Duke L.J. 199, 222 ("Where the agency has rested [a] decision on an unsustainable reason, the court should generally reverse and remand even though it discerns a possibility, even a strong one, that by another course of reasoning the agency might come to the same result.”).
For the same reason, the Dissent's reliance on Mars Home for Youth v. NLRB, 666 F.3d 850 (3d Cir. 2011), is unavailing. The dissent’s focus on the same conclusion being reached by ohr court in Mars Home and by the NLRB in this case is irrelevant to the question as to whether the NLRB offered correct reasoning. The NLRB did not. The NLRB did not rely on Mars Home or any post-Attleboro case in its explanation for what effectively recommending discipline meant. Instead, it relied on pre-Attleboro reasoning that we held was unreasonable in Attleboro. Just as the NLRB cannot rely on post hoc reasoning, the Dissent cannot now use Mars Home to fill in the hole in the NLRB’s decision. See ICC v. Bhd. of Locomotive Eng'rs, 482 U.S. 270, 283, 107 S.Ct. 2360, 96 L.Ed.2d 222 (1987) ("[A] coúrt ... may not affirm on a basis containing any element of discretion—including discretion to ... interpret statutory ambiguities—that is riot the basis the agency used, since that would remove the discretionary judgment from the agency to the court.”). We agree that it may be inefficient to make the NLRB interpret the statute anew even though it may ultimately reach the same result, but that is a function of Chenery, which we must apply. Cf. Margaret B. Kwoka, Deference, Chenery, and FOIA, 73 Md. L. Rev. 1060, 1109-10.(2014) ("[Cjritics argue that the Chenery principle leads to inefficient proceedings....”).

. Among those findings are:
- "[Discipline issued to a CNA is investigated by unit managers or upper management.” JA0861.
- “The LPN becomes involved only as a fact witness to the underlying incident.... LPNs are simply reporting factual findings to their superiors without any specific recommendation for disciplinary action.” JA0861, 0873.
- "LPNs rarely if ever checkmark the penalty level of discipline because they do not have access to employees' personnel files and do not know where the employee stands in the progressive disciplinary scheme.” JA0861.
- LPNs are not told “the outcome of a disciplinary matter” and do not attend meetings where the "discipline is served.” JA0861-62.
- "The DON or other upper management officials make all final disciplinary decisions.” JA0862.
- "The record shows LPN involvement in actual progressive discipline of CNAs 33 times over a 6 ½ year period.... Even assuming arguendo that the actions of the LPNs cited by the Employer constituted discipline or the effective recommendation of discipline, the record still yields a minor number of instances over a six-year period in which these actions were exercised.... I am reluctant to extinguish Section 7 rights here on such a slender record of disciplines over a six year stretch.” JA0871, 0876.

. The Board did not request deference to their reading of the statute under Chevron, U.S.A., Inc. v. Nat’l Res. Def. Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), or Nat’l Cable & Telecomms. Ass’n v. Brand X Internet Servs., 545 U.S. 967, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005), as they did in Palmetto Prince George Operating, LLC v. NLRB, 841 F.3d 211, 216-17 (4th Cir. 2016) (deferring to the Board’s interpretation of the NLRA under Chevron and Brand X to hold that nurses were not supervisors). Had they done so, it would not have availed them here.
Unlike in Palmetto Prince George, the Board has not pointed to a new interpretation after the relevant controlling precedent. See Palmetto Prince George, 841 F.3d at 215-16 (relying on a 2006 NLRB interpretation instead of its 1998 precedent); see also Levy v. Sterling Holding Co., LLC, 544 F.3d 493, 502 (3d Cir. 2008) (“[T]he Supreme Court left no doubt that if a court of appeals interprets an ambiguous statute one way, and the agency charged with administering that statute subsequently interprets it another way, even that same court of appeals may not then ignore the agency’s more-recent interpretation.” (emphasis added)). Here, the Board relies on an interpretation that we already held was an unreasonable interpretation of the statute in Attleboro. NLRB v. Attleboro Assocs., Ltd., 176 F.3d 154 (3d Cir. 1999) (“[W]e see no need to reduce the deference that we normally afford the Board, as we find the Board’s interpretation of 'independent judgment' inconsistent with the NLRA under the traditional deferential standard of review....” (citing NLRB v. Health Care & Ret. Corp. of Am., 511 U.S. 571, 576, 114 S.Ct. 1778, 128 L.Ed.2d 586 (1994))). Chevron or Brand X deference would not allow us to adopt an unreasonable interpretation. See Brand X, 545 U.S. at 980, 125 S.Ct. 2688 ("In Chevron, this Court held that ambiguities in statutes within an agency's jurisdiction to administer are delegations of authority to the agency to fill the statutory gap in reasonable fashion.”).
This case is also unlike Mars Home for Youth, on which the dissent heavily relies. The Mars Home Regional Director’s opinion is in marked contrast to the one in this case. See Mars Home for Youth, Case No. 6-RC-12692 (Dec. 3, 2009) (regional director’s decision), available at http://apps.nlrb.gov/link/ document,aspx/09031d45802a3b2c. In Mars Home, the regional director set forth detailed analysis based on a series of post-Attleboro cases, primarily Berthold Nursing Care Ctr., Inc., 351 N.L.R.B. 27 (2007), cited as Oak Park. Because reliance on Oak Park is actually a new interpretation, the NLRB would have been entitled to Brand X deference in that case. We further note (a) that Petitioner Mars Home for Youth did not cite Attleboro and therefore the case was not before the court, and (2) Mars Home for Youth did not analyze the definition of "effectively to recommend” "discipline,” 29 U.S.C. § 152(3), the key issue here.