DOUGLAS, ADMX., APPELLANT, *v.* DANIELS ET AL., AP-
PELLEES.

(Decided March 1, 1938.)

*Messrs. Harrison & Marshman* and *Messrs. Paulin
& Frazier,* for appellant.
*Mr. Harold U. Daniels,* for appellees.

CARTER, J. This cause is before this court on appeal on questions of law. The action below was one for wrongful death. Plaintiff, in her amended petition, alleges substantially the following: That by appointment of the Probate Court of Lake county she was duly appointed administratrix of the estate of Verne Douglas, deceased, who came to his death on the 28th day of October, 1935; that the appointment was made on the 27th day of November, 1937, and that she is and has been since that date the duly qualified and acting administratrix of the estate; that she commenced this action on the 27th day of October, 1937, by filing the original petition, and that said petition was filed by her as administratrix of the estate of Verne Douglas, deceased; that prior to the filing of the action she received forms from the Probate Court of Lake county which she mistakenly thought were letters of administration and advised her attorneys that she had received her letters of administration; that the filing of the original petition and the commencement of the action was done on behalf of the estate of Verne Douglas, deceased, and for benefit of the parties named therein and that as administratrix she now adopts and ratifies her acts in commencing the action. She then alleges that her decedent left surviving him as heirs at law and next of kin the widow, who is the administratrix, a son, age eight, and a daughter, age seven, who all lived with and had a pecuniary interest in the life of decedent and for whose benefit the action was brought. She further alleges that the Daniels Brothers Coal Company is a corporation and owns and carries on a general mercantile business in connection with which coal, oil and gasoline were purchased at wholesale and sold at retail on premises situated in Willoughby township; that the defendants carried on the business and particularly the oil and gasoline portions of the business by the maintenance of a spur from the Nickel Plate Railroad Company's tracks and

that from time to time road oil, fuel oil and gasoline were purchased in car load lots and the respective tank cars switched on the spur track adjacent to large cylindrical steel tanks and that the oil and gasoline were conducted from the tank cars to a pump house and thence to one or the other of four large storage tanks; that from one of these storage tanks, which was used for the storage of fuel oil, a pipe leads to the retail gasoline station and retail sales of fuel oil were made to the general public from a spigot at that point; that on or about the 27th day of October, 1935, the decedent went to the place of business of defendants for the purpose of purchasing a quantity of fuel oil and thereupon did purchase what was represented by defendants to be fuel oil and the container which he carried was filled by defendants from said spigot at the retail gasoline station; that the defendants had caused or permitted said fuel oil to be largely intermixed with gasoline or naphtha so that the actual contents of the container as sold and delivered to plaintiff's decedent consisted of a mixture of fuel oil, gasoline or naphtha; and that a few days subsequent to the purchase thereof and while plaintiff's decedent was engaged in using the contents of the container at his residence and by reason of the presence of the gasoline or naphtha, a quantity of highly explosive vapor was caused to come from the container so that an explosion thereof ensued causing the plaintiff's decedent to be so burned and injured that shortly thereafter and on the day following he came to his death.

The specific grounds of negligence summarized are as follows:

"1. In providing a mechanical connection between the various storage tanks of such inadequate and improper character that in attempting to fill one of said storage tanks, by inadvertence or carelessness it was likely that a fluid intended for one storage tank would be pumped in whole or in part into some other tank.

"2. In causing or permitting a quantity of gasoline or naphtha to be pumped into the fuel oil tank.

"3. In causing and permitting said gasoline or naphtha to remain in said fuel tank after the defendants knew or in the exercise of ordinary care ought to have known of the presence of said gasoline or naphtha in said fuel oil storage tank.

"4. In failing to promulgate and enforce reasonable rules with reference to the pumping of gasoline or naphtha from tank cars into storage tanks.

"5. In failing to adequately supervise the said process of pumping gasoline from tank cars into storage tanks.

"6. In continuing to sell fuel oil from fuel oil storage tank after defendants knew or in the exercise of ordinary care ought to have known that gasoline or naphtha had become mixed with said fuel oil.

"7. In selling to the public as fuel oil a mixture of oils which the defendants knew or in the exercise of ordinary care ought to have known was dangerous for use as fuel oil by reason of the presence of said gasoline or naphtha therein.

"8. In failing to warn the plaintiff's decedent of the presence of gasoline or naphtha in said fuel oil and of the dangers incidental to the use thereof."

She further alleges that as a direct and proximate result of the complete indifference and wanton misconduct of the defendants, plaintiff's decedent while engaged in using said fuel oil in his home suffered burns so that he died as a direct result thereof, and prays for judgment in the sum of $35,000. As a second cause of action, she alleges that for the period of approximately one day plaintiff's decedent survived the injuries and suffered the most excruciating pain and agony; that his skin was so burned and seared, particularly in the region of his head, chest and arms, that he suffered the most extreme physical torment and that he lived during the most of this time in ap-

prehension of imminent death; and that by reason of these facts she was required to expend money for medical and hospital care and attention, funeral and burial requirements. She prays judgment on the second cause of action in the sum of $10,000.

To this amended petition an amended demurrer was filed by the defendants and the following grounds are set forth in the demurrer:

"1. That the plaintiff did not have legal capacity to sue at the time the petition was filed.

"2. That the petition does not state a cause of action.

"3. That the amended petition is barred by the statute of limitations, not having been filed within two years of the date of the death of the decedent."

This demurrer was by the trial court overruled. Thereupon an answer was filed in which the defendants admit that the Daniels Brothers Coal Company is a corporation carrying on a general mercantile business in connection with which coal, oil and gasoline are sold and as a first defense deny that the plaintiff was administratrix of the estate of Verne Douglas, deceased, when action was brought against these defendants and deny that she was appointed or qualified as administratrix of such estate until more than two years after the date of his death. As a second defense the defendants allege that at various times the coal company has sold fuel oil to retail customers and that Verne Douglas was listed among its retail cash customers and purchased a number one fuel oil known as "water white" distillate from the defendants, and for want of knowledge they deny that the particular fuel oil which caused the death of Verne Douglas was purchased from the Daniels Brothers Coal Company and ask strict proof thereof, and specifically deny that at any time fuel oil sold by the Daniels Brothers Coal Company was intermixed either with gasoline or with naphtha or that such intermixed oil was dispensed

to the late Verne Douglas or to any other person, and allege that the death of Verne Douglas was solely and proximately caused by his own carelessness and negligence in kindling an ordinary coal and wood fire with number one fuel oil and in throwing such fuel oil upon a blazing fire in such manner that such fuel oil exploded. And there is found a general denial of all allegations in plaintiff's petition not admitted to be true.

As a reply to the answer of defendants the plaintiff denies that the substance with which the decedent attempted to start a fire was fuel oil and avers that the manner in which the decedent was starting the fire was a safe way of starting said fire with fuel oil and was made dangerous only by the fact that said substance was of a highly volatile and explosive character, all of which was unknown to plaintiff or plaintiff's decedent and denies every other allegation not admitted to be true.

The cause came on for trial in the Court of Common Pleas, Lake county to the court and jury and at the conclusion of plaintiff's testimony a motion was made for a directed verdict in favor of defendants, which motion was by the trial court sustained and a verdict returned in favor of defendants. Motion for new trial was overruled, judgment entered on the verdict and appeal is prosecuted to this court.

Two questions are presented to this court for consideration and determination:

1. Was the action barred by the statute of limitation by reason of the fact that at the time plaintiff filed her petition, which was prior to the expiration of the statute of limitation, being two years in a wrongful death action, she was not duly appointed and qualified as such administratrix and was not so appointed and qualified until the expiration of two years after the decedent's death?

2. Was the decedent guilty of negligence as a matter of law precluding recovery?

The action was brought on the day preceding the date on which the action would have been barred. However, there is a statement in the brief of plaintiff that long prior thereto an action had been begun in Cuyahoga county but plaintiff was unable to secure service on defendants in that county and thereupon on the date above indicated plaintiff brought her action in Lake county, the place of residence of defendants. The evidence is undisputed that at the time both actions were instituted plaintiff had not actually been appointed administratrix by the Probate Court of Lake county. There is evidence in the record that the administratrix presented herself to the Probate Court asking to be appointed; that blank papers were given her for the purpose and that she communicated with her Cleveland counsel and stated to them that she had been appointed and counsel assuming such to be the case instituted the action and it was not discovered that she had not been actually appointed until after the statute of limitations had come into operation. Is plaintiff barred by reason of the above-recited facts? A review of cases from various jurisdictions discloses a contrariety of judicial decision where such or similar cases have been before the courts, some courts holding that under such circumstances plaintiff is barred and cannot prosecute an action for wrongful death under the statutes. Other courts hold to the contrary.

We have a few cases in this state which throw some light on the question presented. Under the doctrine of "relation back," some courts have held that acts done by the administratrix prior to appointment which are for the benefit of the estate are validated and ratified by her subsequent appointment and qualification. In the case at bar plaintiff had the first right under the statutes to be appointed administratrix. She alleges that she filed the action as administratrix of her

husband's estate and on behalf of his next of kin and in her amended petition alleges that she adopts and ratifies her prior act in commencing the action.

In 18 Ohio Jurisprudence, 221, Section 175, under the subject ''Executors and Administrators,'' it is stated:

''The title of the personal representative to the assets, whenever appointed, relates back to the time of the death, and in contemplation of law the estate is in process of administration from that time, legalizing the acts of the appointee performed between the date of the death of the owner of the property and that of the appointment, when in accordance with the powers conferred by law. Among matters so ratified and validated have been receipts of money or property of the estate which must be accounted for, payment of debts and legacies, and compromises and settlements. The general rule legalizing all acts otherwise validly done by the administrator before his appointment, and vesting in him a cause of action accruing between the death of the intestate and the granting of letters, has been applied to a suit for damages for wrongful death brought by an administrator who was appointed but who did not qualify for two years after the death; and also in a case of a family settlement in which one of the next of kin and heirs settled and adjusted the affairs of the estate of a decedent, collecting assets and paying debts, and was later duly appointed administrator. * * *

''The general rule also is that the due qualification of an administrator relates back to the time of his appointment as regards acts done by him in the interim which are for the benefit of the estate. An example is the commencement of a suit by the administrator, which is valid in spite of delay in perfecting the bond and receiving the letters of administration. Such an omission to qualify cannot possibly prejudice the rights of defendants on the merits of the case.''

In the case of *Archdeacon, Admr.,* v. *Cincinnati Gas*

*& Elec. Co.*, 76 Ohio St., 97, 81 N. E., 152, the court recognized the doctrine of "relation back." In this case Archdeacon filed his petition on March 28, 1903, stating that he was a duly appointed and qualified administrator of the estate. Shortly thereafter defendant filed separate answers admitting the capacity of plaintiff as administrator. On March 3, 1905, more than two years after the date of the decedent's death the defendant in the case discovered that plaintiff had never qualified as administrator and asked leave to amend their answer denying the plaintiff's qualification, which leave was granted by the trial court. Error proceedings were prosecuted to the Supreme Court and that court held that the trial court was in error in allowing the amendment and further held under the doctrine of "relation back" that the plaintiff had capacity to commence the action prior to his qualification. While the fact that the defendant filed an answer in that case admitting plaintiff's qualification presents a point of difference, the court laid down the following in the syllabus:

"4. The general rule that the due qualification of an administrator relates back to the time of his appointment as regards acts done by him in the interim which are for the benefit of the estate, applies to a case of this character. The commencement of the suit by the administrator, therefore, being for the benefit of the estate, was the valid commencement of an action."

The court says further on page 103:

"It must be apparent from the foregoing statement that the defense sought to be made by the amended answer, and the motion to dismiss, was based upon a mere technicality. The plaintiff having fully qualified as administrator before the case was reached for trial every right of the defendants upon the merits of the case was fully preserved, and in no possible aspect could the delay in perfecting the bond and receiving

the letters of administration prejudice the defense of the defendants upon the real meritorious question involved in the controversy, which was, whether or not the defendant's negligence was the cause of the death.''

In the instant case plaintiff was appointed and fully qualified before the case came on for trial. The court in the *Archdeacon case* says further on page 106:

''* * * We think it does not follow that the failure to fully qualify within the two years defeated the action. The qualification, when made, following a general rule that the appointment relates back, related back at least to the time of the filing of the petition, and that was not a void performance, being an act done during the interim which act was for the benefit of the estate. It could not be otherwise, for it was an attempt to enforce a claim which was the only asset of the estate. This rule is sustained by a large number of authorities, and seems to be quite generally recognized. It appears, also, to be just and equitable.''

In the case of the *Estate of Pollock*, 17 N. P. (N. S.), 490, 60 W. L. B., 273, it was held in the syllabus that where one of the next of kin made an agreement to settle and adjust the affairs of the estate and was later appointed administrator, that ''the letters of administration so issued relate back to the death of the decedent and thereby legitimate all transactions made under and by virtue of such arrangement; and such subsequent appointee may claim and be allowed the statutory per centum upon all assets so collected and disbursed and for such purpose letters of administration likewise relate back to the death of the decedent.'' And the court quotes numerous authorities in sustaining this holding. One of the cases cited by the court in the *Pollock case* held:

'' 'This doctrine of relation is a fiction of law to prevent injustice and the occurrence of injuries where otherwise there would be no remedy; and would not

be applied in cases where the rights of innocent parties intervened.' "

Of course, in the case at bar, there is no injury being done to third parties. Other decisions adhering to the doctrine of "relation back" are: *Globe Accident Ins. Co.* v. *Gerisch,* 163 Ill., 625, 45 N. E., 563, 54 Am. St., 486, wherein the court held that there was a well-settled principle of law, the doctrine of relation. Under it the grant of letters of administration related back to the date of intestate's death and validated all actions which came within the scope of an administrator's authority and which were in their nature beneficial to the estate. And other authorities are cited by the court in that case. For similar pronouncements see the cases of *Robertson* v. *Burrill,* 22 Ont. App. R., 356; *Townsend* v. *Ingersoll,* 43 Howard's Prac. Rep. (N. Y.), 276. It appears to be a recognized principle of law that where an action has been commenced within the period of limitations the courts will not permit some technical mistake or failure upon the part of the person bringing action to permit the defendant to rely upon the statute. Courts have been somewhat liberal in allowing the rectification of a mistake after the statute of limitations has run, so long as the action was initiated before the statute had become effective. In the case of *Ohio, Indiana & Kentucky Heater Co.* v. *Shafer,* 19 Ohio App., 399, a petition was filed within the statutory period in the name of the Ohio, Indiana & Kentucky Heater Company, a corporation existing under the laws of Ohio. Thereafter, after the statute of limitations had run but before an answer had been filed, an amended petition was filed in the case changing the name of the plaintiff to Andrew J. English, doing business under the firm name and style of Ohio, Indiana & Kentucky Heater Company, containing the allegation in the amended petition that the statement in the original petition alleging plaintiff was a corporation was a mistake and that the title of the cause

of action was changed to conform to the facts. A motion was filed to strike the original petition from the files on the ground that it was a sham and an affidavit filed in support of the motion. The trial court granted the motion and thereafter defendant filed a second motion to strike the amended petition from the files which motion was also sustained by the trial court. Plaintiff prosecuted error to the Court of Appeals. The Court of Appeals in reversing the trial court said:

"The original petition on its face shows a good cause of action. It contained the proper allegations of a corporation duly organized under the laws of the state of Ohio. Whether plaintiff was such was a question of fact, and a defense to the action, and should have been raised by answer. That an allegation of fact may be untrue does not stamp the pleading as a sham. Moreover, before the filing of the motion to strike the original petition from the files, the plaintiff had filed his amended petition, correcting the statement of corporate existence and changing the title to the name of the real party in interest. This in no wise changed the cause of action, and the plaintiff was within his rights in filing the amended petition before answer. Sections 11360 and 11363, General Code.

"It is urged that the amended petition should be stricken from the files for the reason that after the filing of the original petition, and before the filing of the amended petition, the cause of action was barred by the statute of limitations. This would undoubtedly be true if the court was correct in striking the original petition from the files, but the court was in error in striking the original petition from the files. The amendment changing the name of the plaintiff to conform to the fact does not change the cause of action. The action still remains against the defendant, as alleged in the original petition, and the court does not lose jurisdiction over the defendant and the rights

that existed at the time of the filing of the original petition.''

It is quite apparent in the above case that plaintiff had no capacity to sue as a corporation. And it was held in substance that the statute of limitations was not a bar to the proceeding. While, as hereinbefore indicated, there are cases in which courts have held to the contrary, we are constrained to conclude from the above citations and holdings that the court was right when it overruled the demurrer to plaintiff's petition and was in error in holding at the trial of the case that the action was barred by the statute in that plaintiff had no capacity to bring the action.

Counsel for defendants has called the court's attention to the case of *Weidner* v. *Rankin*, 26 Ohio St., 522, and the case of *Brown* v. *Sunday Creek Coal Co.*, 165 F., 504. However, a careful perusal of those cases discloses that they are distinguishable from the case at bar. In those cases the actions were not commenced purportedly by an administrator mistakenly of the belief that the appointment had been made, but were instituted by individuals who had no capacity to bring the action.

As to the second problem presented to this court: Was the decedent guilty of contributory negligence as a matter of law which directly and proximately contributed to his death or was a factual and therefore a jury question presented? First of all there is strong evidence in the record that there was an admixture of either gasoline or naphtha with the fuel oil which was purchased by the decedent who was using same at the time the can exploded in his hands. At least there was sufficient evidence to go to the jury on that phase of the case. The evidence is undisputed that the explosion occurred while decedent was kindling a fire with what he supposed to be fuel oil. His wife who was present at the time testified ''that he put the paper in the stove, put kindling on top of the paper

with coal on top of the kindling. He lighted the piece of paper and picked up the three-gallon oil can under the oil stove where they kept it and gave it a 'little surge' and as he brought it back it seemed as if it exploded. I saw him give a surge with his hand to the can like that [indicating], and just as he drew it back it exploded and saturated him and burned him.''

Under this evidence was the decedent guilty of negligence or contributory negligence as a matter of law by placing paper, kindling and coal in the stove, then lighting same and pouring what he supposed to be fuel oil on the blaze? It becomes necessary to state something about the nature of fuel oil as disclosed by the record. F. K. Bessenberger, a chemist, was called by the plaintiff and he explained the nature and composition of fuel oil stating that fuel oil, like kerosene, naphtha, gasoline and motor oil, is a petroleum product. First, it is important to know the meaning of ''flash point'' as flash point indicates the explosive qualities. It was defined by Mr. Bessenberger as follows:

''Well you see the flash point must be really clearly understood to understand things of that kind. The flash point is the temperature when you heat one of these materials at which it will give off enough vapors to make an explosive mixture.''

He then explained the nature of fuel oil and compared it to gasoline, naphtha, kerosene and motor oil.

''Q. Now will you just tell us generally what fuel oil is and what gasoline is and naphtha and kerosene? That is, what is the basic product; how is it obtained? A. All of those products are made from crude oil which naturally comes from the earth and that is put into a piece of equipment called a still where it is heated up and caused to vaporize and the vapors are caused to pass into what we call a condenser, cooling pipe so that it recondenses back into a liquid and that way depending on how high you heat this material and what

you take off from the bottom of the still you get the different things. The first thing that comes off is a very light material which we will call petroleum ether. It has no particular commercial use. The next thing that comes off is gasoline which we are all familiar with. The next thing that comes off is naphtha and the next thing is kerosene and the next thing which comes off would be fuel oil and then light motor oil, medium motor oil, heavy motor oil, etc., so that all these materials are pretty much the same thing except that they differ in inflammability. Gasoline being more inflammable than naphtha and naphtha more than kerosene and kerosene more than fuel oil, etc.''

According to this explanation we find that fuel oil is a petroleum product of a somewhat lower grade than kerosene and is less volatile. We are all quite familiar with kerosene and the evidence discloses that fuel oil has a higher flashpoint than kerosene and that it was therefore less explosive.

In connection with the testimony of the chemist that the flash point of fuel oil is higher than that of kerosene this question was propounded:

''Q. And that means, if I understand you correctly, that kerosene will ignite more readily and vapor will arise at the lower temperature than would be true of fuel oil? A. That is right.

''Q. So that kerosene is really a more explosive material than is fuel oil? A. Yes, sir.''

According to this testimony, had the purchase made by decedent been fuel oil it would be less inflammable and less volatile than kerosene. An examination of this particular fuel which was purchased as claimed by the plaintiff by actual test disclosed that it had a flash point of 60 degrees or less indicating that there was some other substance in the fuel oil purchased more inflammable character than fuel oil. The ꜛꜛal court in directing a verdict held as a matter of law that it constituted negligence on the part of decedent to

pour fuel oil on a blaze in kindling a fire. This holding was directly opposite to the testimony of not only the expert chemist but also the testimony of lay witnesses that no explosion would have occurred had the fluid been fuel oil. The chemist testified that when an explosion occurs by reason of a volatile fluid, such as gasoline, naphtha or ether, that the explosion is due to the igniting of the inflammable vapors mixed with air and that is the only condition under which it will explode. He further testified that if there are no vapors present a liquid such as was discussed in this case could not explode. He testified that:

"If you would take a can of gasoline or naphtha and had a fan blowing across it so that it kept vapor blowing away as fast as it came off and you would put a match on top of that gasoline it would ignite the gasoline but would not explode."

This question was propounded:

"Q. Now, if you poured, we will say, fuel oil on to an open flame and assuming that the fuel oil was standing in a room during the day which had a temperature between 60 and 75 degrees and it is standing in an oil can and there is a piece of paper and kindling put in the fire and you light it and then take this can of fuel oil with the flash point that you have described, being from 100 up to 150, and you poured that on the blazing fire in the stove would you get an explosion? A. No, I don't think you would."

And his explanation was that:

"You must clearly understand the flash point. Flash point is the temperature when you heat one of these materials at which it will give off enough vapors to make an explosive mixture so that when he tells me the material had a flash point of 100 and that it is standing in a room that is 75, I know that it can't make the necessary vapors to cause an explosion. Now then when it is poured on the fire, of course, it gets hotter but as soon as it gets hot with the flame right there the

vapors which are formed burn so that you get a progressive burning. You would not get an explosion.''

This question was propounded:

''Q. Now, assuming also you had a more volatile fluid than fuel oil, one with a low flash point, a flash point of 60 or below and that has been standing in a room where the temperature is 60 or above, what happens inside that oil can? A. That oil can gets filled with explosive vapors, bearing in mind the flash point he is talking about at that temperature that material gives off these vapors and fills the can. Then if the can has some air in it you have all the conditions necessary for a violent explosion if you ignite it.''

This makes this technical point quite understandable and that is that the volatile liquid, standing in a can in a room where the temperature is lower than the flash point of the liquid, will not give off and accumulate enough vapors which could cause an explosion. That is, before fuel oil which has a flash point of 100 degrees or more could give off necessary vapors the room temperature would have to be 100 degrees or better. On the other hand, if the flash point of the volatile fluid is less than room temperature obviously vapors will be given off constantly which when ignited will explode if the vapors of the fluid are sufficiently confined. The evidence discloses that the room temperature where this can of oil stood on the day in question was between 60 and 70 degrees. In the light of this evidence had the flash point of the material purchased for fuel oil been 100 degrees or more it is quite probable that no explosive vapors could have accumulated in the can. The chemist further testified that on the day of the explosion there was an accumulation of vapors inside of the can and that this is what caused the can to explode and he further testified that fuel oil, if the flash point is 100 or above, would not create sufficient vapor standing in the room with a temperature of between 60 and 75 degrees to cause an explosion and

that under the circumstances if fuel oil had been poured upon a blaze there could have been no explosion of the can.

Lay witnesses testified as follows: Mrs. Douglas, the decedent's wife, testified that they had purchased fuel oil from Daniels Brothers Coal Company over a long period of time and that her husband always kindled the fires in the same manner as when the explosion occurred and that he had instructed her about kindling same. Sylvan Manross testified that it was his practice to place the oil on fires in starting the fire; that on many occasions he poured oil on the open fire and nothing ever occurred in the way of an explosion; and that: "If you pour such on live coals that it might explode and that it was not true when the same was poured on a flame."

And he further testified that he never classed such as dangerous when poured upon an open flame. Mrs. Ella Manross, mother of Mrs. Douglas who was born and raised among the oil fields of Pennsylvania, said that she had had much experience with kerosene and some with fuel oil and said that she had used fuel oil and kerosene for the kindling of fires and had observed others doing the same and testified that in her younger days all the neighbors used the same method and that she had observed many different families using the same method for starting fires since she came to Ohio.

There appears to be no case directly in point as to whether such an act as pouring fuel oil upon a flame to start a fire would be negligence as a matter of law. In the case of *Standard Oil Co.* v. *Reagan,* 15 Ga. App., 571, 84 S. E., 69, the question involved was whether it amounted to contributory negligence as a matter of law to attempt to start a fire by pouring gasoline which was thought to be kerosene and in that case, after some discussion concerning the subject, the court said on page 577:

"* * * We think the whole matter should be relegated to the jury for determination, and a recovery would depend upon the evidence disclosing whether or not kerosene oil could be used with safety in the manner the petition alleges it was actually employed by the deceased; and therefore, the court did not err in overruling the demurrer."

To the same effect, see *Dronette* v. *Meaux Bros.*, 156 La., 239, 100 So., 411.

The writer of this opinion is of the belief that at least in the years gone by it was the common practice of people to use kerosene in the kindling of fires and it seems to this court that it would be going a long way to hold that one who did so, under the testimony in this case by both expert and lay witnesses that such was not dangerous, was guilty of contributory negligence as a matter of law.

It is true that some courts have held that the pouring of fuel oil upon a blazing fire is negligence in and of itself that would preclude recovery. However, when an expert and layman testify that in their opinion there was no danger in so doing until at least the surrounding temperature was of sufficient height to produce a vapor properly mixed with air to cause an explosion, we are not inclined to hold in the face of such testimony that it would be dangerous and that different minds could come to but one conclusion from the testimony that decedent was guilty of contributory negligence. Of course, the defendants have produced no evidence as the court directed a verdict before the introduction of any testimony on behalf of the defendants. It is possible that in the trial of the case evidence may be introduced by experts contrary to the testimony of the chemist called in this case. And if there is disputed evidence in the record it would surely be a factual question for the jury to determine.

Coming to these conclusions we are of the opinion that the court erred in directing a verdict in favor of

the defendant on the ground that plaintiff had no legal capacity to sue and further that the court was in error when it held that the decedent was guilty of contributory negligence as a matter of law. Coming to these conclusions we reverse the judgment of the lower court and remand the cause for further proceedings according to law.

*Judgment reversed and cause remanded.*

NICHOLS and BENNETT, JJ., concur.