**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 20-1504 & 20-1606
_____

ATLANTIC CITY ELECTRIC COMPANY,
Petitioner in No. 20-1504

v.

NATIONAL LABOR RELATIONS BOARD,
Petitioner in No. 20-1606
_____

On Petition for Review and Cross-Application for
Enforcement from the National Labor Relations Board
(No. 04-CA-224253)
_____

Argued:  December 15, 2020
_____

Before: GREENAWAY, JR., SHWARTZ, and FUENTES,
*Circuit Judges*.

(Filed: July 7, 2021)

Michael E. Kenneally **[ARGUED]**
Jonathan C. Fritts
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, N.W.
Washington, D.C. 20004

Julia S. Sturniolo
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103
      *Counsel for Atlantic City Electric Company*

David Casserly **[ARGUED]**
David Habenstreit
Elizabeth A. Heaney
National Labor Relations Board
1015 Half Street, S.E.
Washington, D.C. 20570
      *Counsel for National Labor Relations Board*

Mark E. Belland
Kevin D. Jarvis **[ARGUED]**
David F. Watkins Jr.
O'Brien, Belland & Bushinsky, LLC
509 S. Lenola Road, Building 6
Moorestown, NJ 08057
      *Counsel for International Brotherhood of Electrical*
      *Workers Local 210*

Lucas R.J. Aubrey
Bart Sheard
Sherman Dunn
900 7th Street, N.W., Suite 1000
Washington, D.C. 20001
  *Counsel for International Brotherhood of Electrical Workers, AFL-CIO*

———————————

OPINION OF THE COURT

———————————

FUENTES, *Circuit Judge*.

Atlantic City Electric Company (the "Company"), a public utility that provides electricity in southern New Jersey, seeks our review of a decision by the National Labor Relations Board (the "Board") finding that the Company violated Sections 8(a)(5) and (1) of the National Labor Relations Act (the "Act") by refusing to bargain with a unit representing the Company's system operators. Because the Board's determination is supported by substantial evidence, we will deny the Company's petition for review and grant the Board's cross-application for enforcement.

**I.**

The Company operates an electrical system from a central dispatch in Mays Landing, New Jersey, known as the

control room.[1]  From the control room, sixteen system operators and fifteen dispatchers manage the Company's electrical transmission and facilitate planned and unplanned field work.[2]  Outside the control room, the Company deploys about 300 field employees who maintain and repair the Company's equipment.

System operators work with a computer program to oversee and remotely control the Company's transmission system.  They prioritize work needs and resources, in consultation with Company guidelines, both for planned maintenance as well as for power restoration during outages. While system operators determine the need for work, field supervisors select crews to undertake it—though the parties dispute the extent to which system operators can require that a crew dispatch to a particular site or remain on site.  System operators also prepare and communicate switching instructions for field employees to follow when de-energizing equipment so that maintenance and repair work can be done safely.

The International Brotherhood of Electrical Workers Local 210 (the "Union") represents a unit of Company

---

[1] We base this background on the undisputed portions of the decision that the Board's Regional Director issued in this case.

[2] The Company designates system operators who manage lower-voltage systems as "system operators" and those who manage higher-voltage systems as "senior system operators." App. 27.  Other than the difference in voltage, the two groups have identical duties.  We refer to both groups together as "system operators."

employees.[3]  The Union petitioned the Board for an election to determine whether system operators would join the existing bargaining unit.  The Company opposed the inclusion of system operators on the basis that they were supervisors within the meaning of Section 2(11) of the Act.[4]  If system operators are supervisors, they are not "employee[s]" under the Act and are therefore not "entitled to the Act's protections [or] includable in a bargaining unit."[5]

The parties presented evidence before a Board hearing officer in February of 2017.  Following the hearing, the Board's Regional Director issued a decision finding that system operators were not supervisors and directing the Company to conduct a self-determination election.  In that election, the system operators voted against joining the bargaining unit.  The following year, the Union filed a second election petition for system operators, and the parties agreed that the Board could rely on the record from the February 2017 hearing.  Incorporating the reasoning and findings from the prior decision, an Acting Regional Director directed the Company to conduct a second election.  This time, the system operators voted to join the bargaining unit, and the Regional Director certified the Union as their representative.

---

[3] The Company's dispatchers, who work alongside the system operators to monitor and prioritize acute service needs for individual customers, are among those employees represented by the Union.

[4] *See* 29 U.S.C. § 152(11).

[5] *Mars Home for Youth v. NLRB*, 666 F.3d 850, 853 (3d Cir. 2011) (citing 29 U.S.C. §§ 2(3), 152(3)).

The Company petitioned for review of the Regional Director's decision. The Board agreed to review the Regional Director's decision with respect to whether system operators have the authority, using independent judgment, (1) to assign employees to places or (2) responsibly to direct employees. A three-member panel of the Board, with one member dissenting, affirmed the Regional Director's decision and adopted his factual findings.

The Company refused to bargain, and the Union filed an unfair-labor-practice charge with the Board. The Board issued a complaint alleging that the Company's refusal to bargain violated Sections 8(a)(5) and (1) of the Act.[6] The Company admitted its refusal to bargain but challenged the Union's certification as bargaining agent on the ground that system operators are supervisors under the Act. The Board found that the Company's refusal to bargain violated the Act and ordered the Company to cease and desist from refusing to recognize the Union.

The Company timely petitioned this Court for review of the Board's decision, and the Board cross-applied for enforcement of its order. The Union intervened in support of enforcement.

## II.

The Board had jurisdiction over the unfair-labor-practice proceeding under 29 U.S.C. § 160(a). We have

---

[6] *See* 29 U.S.C. § 158(a)(5), (a)(1).

6

jurisdiction to review the Board's decision and order pursuant to 29 U.S.C. § 160(e) and (f).

"Our 'review of orders of the Board is highly deferential.'"[7] We "accept the Board's factual findings and the reasonable inferences derived from those findings if they are 'supported by substantial evidence on the record considered as a whole.'"[8] "Where the Board has adopted the Regional Director's findings, we perform our substantial evidence review of the Regional Director's findings."[9] Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[10] "The Board's legal determinations are subject to plenary review, but 'with due deference to the Board's expertise in labor matters.'"[11] We have recognized that "determinations

---

[7] *Coral Harbor Rehab. and Nursing Ctr. v. NLRB*, 945 F.3d 763, 767 (3d Cir. 2019) (quoting *Trimm Assocs., Inc. v. NLRB*, 351 F.3d 99, 102 (3d Cir. 2003)).

[8] *MCPC, Inc. v. NLRB*, 813 F.3d 475, 482 (3d Cir. 2016) (quoting 29 U.S.C. § 160(f)).

[9] *NLRB v. New Vista Nursing & Rehab.*, 870 F.3d 113, 122 (3d Cir. 2017).

[10] *Mars Home*, 666 F.3d at 853 (quotation marks omitted) (quoting *Citizens Publ'g & Printing Co. v. NLRB*, 263 F.3d 224, 232 (3d Cir. 2001)).

[11] *Id.* (quoting *NLRB v. St. George Warehouse, Inc.*, 645 F.3d 666, 671 (3d Cir. 2011)).

respecting supervisor status are particularly suited to the Board's expertise."[12]

## III.

### A. Standard of Proof

The Company first contends that both the Board and the Regional Director held it to an improperly heightened standard of proof. The Company agrees that, as the party asserting supervisor status, it bears the burden of proving supervisory authority by a preponderance of the evidence.[13] The Regional Director's decision correctly recited that standard and found that the Company had not satisfied it, and the Board affirmed.

The Company nevertheless objects to: (1) the Board's and Regional Director's invocation of the Board's longstanding principle that the proponent of supervisor status fails to meet its burden when the evidence "is in conflict or otherwise inconclusive," which the Company says imposes a species of the summary-judgment standard;[14] and (2) the Board majority's use of the words "clear" and "unclear" to describe aspects of the record, which the Company reads as imposing a

---

[12] *Id.* (quotation marks and citation omitted).

[13] *See NLRB v. Ky. River Cmty. Care, Inc.*, 532 U.S. 706, 711-12 (2001); *In re Oakwood Healthcare, Inc.*, 348 N.L.R.B. 686, 694 (2006).

[14] App. 5 n.3 (citing *Phelps Cmty. Med. Ctr.*, 295 N.L.R.B. 486, 490 (1989)), 21.

clear-and-convincing standard.[15]  The Board responds that we lack jurisdiction under Section 10(e) of the Act to consider these arguments because the Company failed to raise them before the Board.[16]  We agree.

Beginning with the Company's first argument, the closest the Company came to raising this issue before the Board was a broad objection to the "evidentiary principles" and "unduly restrictive approach" that the Regional Director applied.[17]  In the final pages of the Company's briefing before the Board, it argued that the Regional Director's decision "reveals the Board's increasing reliance on doctrines and evidentiary principles regarding Section 2(11) authority that are irreconcilable with the Act, which preclude a finding of supervisor status even when the record contains dispositive evidence of Section 2(11) authority."[18]  The briefing then block-quotes nearly two full paragraphs of the Regional Director's decision reciting eight different legal standards applicable in supervisor cases.  In the middle of this list is the

---

[15] App. 5 n.3.

[16] *See* 29 U.S.C. § 160(e) ("No objection that has not been urged before the Board . . . shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances."); *Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 666 (1982) ("[T]he Court of Appeals lacks jurisdiction to review objections that were not urged before the Board . . . .").

[17] A.R. 623-24, 703-04.

[18] A.R. 623, 703.

9

principle that "[w]here the evidence is in conflict or otherwise inconclusive on particular indicia of supervisory authority, the Board will find that supervisory status has not been established."[19] The briefing then argues that "Congress did not include any of the above qualifications in the definition of supervisor status," and urges the Board to hold that the quoted rules "are inconsistent with Section 2(11), on its face, and . . . [to] abandon those principles and overrule those decisions that have articulated and applied them."[20]

This all-purpose challenge to what the Company described to the Board as "an array of doctrines" does not sufficiently raise the instant standard-of-proof argument to preserve it for our review.[21] "In order to meet the requirements of Section 10(e), an objection must be specific enough to place the agency on notice of the party's objections."[22] The Company's only reference to the now objected-to "in conflict" principle, buried in a block quotation among seven other rules and advancing the nebulous assertion that all eight doctrines are collectively "inconsistent with Section 2(11)," is barely more than a generalized exception to the Regional Director's entire statement of the law.[23] Even if we read these two pages

---

[19] A.R. 623 (quoting App. 21), 703 (quoting App. 21).

[20] A.R. 623-24, 704.

[21] A.R. 593, 669.

[22] *Int'l Brotherhood Elec. Workers v. NLRB*, 973 F.3d 451, 460 (5th Cir. 2020) ("*Entergy IV*").

[23] *See Marshall Field & Co. v. NLRB*, 318 U.S. 253, 255-56 (1943) (holding that "general objection[s]" do not "afford[] the

as a specific challenge to the "in conflict" principle, the Company now objects to it on different grounds.[24]  The Company's earlier objection, based on different reasons rooted in a different provision of the Act, could not have afforded the Board "adequate notice of the basis for the objection" now asserted.[25]

---

Board opportunity to consider on the merits questions to be urged upon review of its order").

[24] *Compare* Company Br. 23, 25-27, 30 (arguing that the "in conflict" principle imposes a heightened summary-judgment-like standard inconsistent with the preponderance standard mandated by Section 10(c) of the Act, *see* 29 U.S.C. § 160(c)) *with* A.R. 622-24, 702-04 (arguing that the eight quoted principles are inconsistent with the definition of supervisor status located in Section 2(11) of the Act, *see* 29 U.S.C. § 152(11)).

[25] *NLRB v. FedEx Freight, Inc.*, 832 F.3d 432, 437 (3d Cir. 2016) (quotation marks and citation omitted).  The Company's reliance on this Court's decision in *FedEx Freight* is unavailing.  In that case, we found an objection preserved where the petition before the Board included a footnote raising the objection "largely for the reasons cited in" a Board member's earlier dissenting opinion.  *Id.* at 437-38.  A concurrence in the Board's decision on review "acknowledge[d]" the objection, which, we explained, "indicate[d] this footnote provided sufficient notice" to the Board.  *Id.* at 438.  Here, the Company's briefing before the Board similarly invoked "the views expressed by former Chairman Miscimarra in *Buchanan Marine* and other cases"—but in support of an entirely separate objection that the Company has since abandoned.  A.R. 622, 702-03.  Indeed, the

11

We likewise find forfeited the Company's second standard-of-proof objection to the Board's observations that the record lacked "clear evidence" on a particular indicium of supervisor status and was elsewhere "unclear."[26] The Company did not make this objection before the Board nor did it seek the Board's reconsideration on this or any basis and offers no explanation for its failure to do so.[27]

---

arguably incorporated reasoning does not take issue with the "in conflict" principle at all, but instead proposes an alternative three-factor test for supervisor status. *See Buchanan Marine, L.P.*, 363 N.L.R.B. No. 58, at *4 (Dec. 2, 2015) (Miscimarra, dissenting); *Chi LakeWood Health*, 365 N.L.R.B. No. 10, at *1 (Dec. 28, 2016) (Miscimarra, dissenting). And, unlike in *FedEx Freight*, the Board's decision here lacks any "acknowledg[ment]" indicating that the Board had notice of this objection. *See FedEx Freight*, 832 F.3d at 438.

[26] App. 5 n.3.

[27] *See Woelke*, 456 U.S. at 666 (holding that a party's failure to "petition for reconsideration or rehearing" of the Board's reasoning "prevents consideration of the question by the courts"); *NLRB v. Konig*, 79 F.3d 354, 360 (3d Cir. 1996) ("[Petitioner's] failure to raise the argument, and certainly its failure to file a petition for reconsideration, deprives this court of jurisdiction to address this question under section 10(e) of the NLRA.").

Section 10(e)'s "exhaustion requirement is jurisdictional."[28] Because the Company did not raise its standard-of-proof objections before the Board, and because the Company does not assert any "extraordinary circumstances" that would excuse that failure, we lack jurisdiction to consider those objections.[29] Of course, in reviewing the merits of the Board's determination that the Company's system operators are not supervisors, we take the preponderance standard "to mean what [it] say[s], and [we] conduct substantial-evidence review on that basis."[30] But we will not take up the Company's invitation to treat the Board's weighing of the evidence as a preliminary legal issue requiring plenary rather than deferential

---

[28] *1621 Route 22 W. Operating Co. v. NLRB*, 825 F.3d 128, 139 (3d Cir. 2016).

[29] 29 U.S.C. § 160(e). We also lack jurisdiction to consider the Company's objection to the Regional Director's statement that "[t]he Board has an obligation not to construe the statutory language too broadly because the individual found to be a supervisor is denied the employee rights that are protected under the Act," App. 21, based on the Supreme Court's decision in *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018). The Company failed to raise this argument or cite *Encino* before the Board (in briefing submitted after the *Encino* decision) and does not defend its failure to do so.

[30] *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 376-77 (1998).

review where the Board was not first afforded the opportunity to consider the objection.[31]

## B. Substantial Evidence

To determine whether an individual is a supervisor under Section 2(11) of the Act, we apply a "three-part test."[32]

> Employees are statutory supervisors if (1) they hold the authority to engage in any 1 of the 12 listed supervisory functions [in Section 2(11)]; (2) their exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment, and (3) their authority is held in the interest of the employer.[33]

Only the first two prongs are disputed here. The Company asserts that system operators are supervisors because they use independent judgment to exercise two statutory indicia of supervisory authority: (1) they assign other employees, and (2) they responsibly direct other employees.[34]

---

[31] *See FedEx Freight*, 832 F.3d at 449-50 (Jordan, J., concurring); *Edward St. Daycare Ctr., Inc. v. NLRB*, 189 F.3d 40, 44, 52 (1st Cir. 1999).

[32] *New Vista*, 870 F.3d at 117.

[33] *Ky. River*, 532 U.S. at 713 (internal quotation marks and citation omitted).

[34] *See* 29 U.S.C. § 152(11).

14

The Board majority concluded that system operators possessed neither authority. "Whether someone is a supervisor is a question of fact, and thus [the Board's determination] will be upheld if it [is] supported by substantial evidence."[35] We apply the Board's interpretations of the terms "assign," "responsibly direct," and "independent judgment," which are reasonable and consistent with the Act.[36]

## 1. Assignment

Assignment includes "the act of designating an employee to a place (such as a location, department, or wing), [or] appointing an employee to a time (such as a shift or overtime period)."[37] "[T]he decision or effective recommendation to affect one of these [assignments] . . . can be a supervisory function."[38] The Company argues that system operators (a) assign field employees to places based on their prioritization of work, which results in crews being dispatched to job sites, and (b) assign field employees to times based on their role in determining when work is cancelled and rescheduled and when work requiring overtime pay may be necessary. Neither argument is persuasive.

---

[35] *Mars Home*, 666 F.3d at 853.

[36] *See id.* at 854 n.2, 855 n.3.

[37] *Oakwood Healthcare*, 348 N.L.R.B. at 689.

[38] *Id.*

15

### a. Assignment to Places

The record supports the Board's and Regional Director's findings that system operators prioritize Company resources but do not assign individual field employees to places. System operators determine the need for work at a given location, then they or the Company's dispatchers request that a field supervisor send a crew to that location. The Company argues that the fact that system operators' prioritization decisions have downstream effects on where field employees end up requires a finding that they assign field employees to places and that the opposite conclusion is inconsistent with the Board's decision in *Entergy Mississippi, Inc.* ("*Entergy III*").[39] We disagree.

In *Entergy III*, the Board held that transmission and distribution dispatchers at a Mississippi electric utility company were supervisors because they assigned field employees to places using independent judgment, relying in part on the dispatchers' exercise of discretion in prioritizing resources during outages.[40] Here, the Board majority distinguished *Entergy III* on the ground that, in contrast to the Mississippi employer, the Company "failed to meet its burden of proving that the System Operators possess the authority to assign . . . employees within the meaning of Section 2(11)," then explained the Company's evidentiary shortcomings.[41]

---

[39] 367 N.L.R.B. No. 109 (Mar. 21, 2019).

[40] *Id.* at *4-5.

[41] App. 5 & n.3.

We agree with the Board that *Entergy III* does not control the outcome in this case.

First, *Entergy III* does not provide a square holding on the issue of assignment-to-place authority. In the *Entergy* cases, the Board assumed the dispatchers could assign employees to places—which the union did not challenge—and its decisions instead turned on the issue of independent judgment.[42] The Board clarified that *Entergy III* should not be read to hold that "prioritization of outages by itself establishes the dispatchers' supervisory authority," since the "allocation of resources and prioritization of outages are not supervisory indicia set forth in Sec[tion] 2(11)."[43] Rather, the Board's

---

[42] *See Entergy Miss., Inc.*, 357 N.L.R.B. 2150, 2156 (2011) ("*Entergy I*") ("Even assuming [dispatchers'] temporary assignment [of employees] to a place of work constitutes assignment . . . the record does not establish that the dispatchers assign . . . using independent judgment."); *Entergy Miss., Inc. v. NLRB*, 810 F.3d 287, 298 (5th Cir. 2015) ("*Entergy II*") (vacating and remanding *Entergy I* solely on independent judgment issue); *Entergy III*, 367 N.L.R.B. No. 109, at *5 (on remand, finding supervisory status because "[1] the dispatchers *undisputedly* assign employees to places, and [2] these places are selected based on the exercise of independent judgment" (emphasis added)); *Entergy IV*, 973 F.3d at 460-62 (affirming *Entergy III* but expressing concern that the Board failed meaningfully to engage with the scope of the dispatchers' purported assignment authority, noting the union's forfeiture of that argument).

[43] *Entergy III*, 367 N.L.R.B. No. 109, at *5 n.7 (internal quotation marks omitted).

17

consideration of the dispatchers' resource-prioritization discretion supported only its independent-judgment finding.[44] Accordingly, we do not read *Entergy III* to require the Board to find assignment authority wherever a purported supervisor prioritizes resources during outages, as the Board explicitly stated that it was not so holding.[45]

Second, the record supports the Board's conclusion here that the system operators cannot assign field employees to

---

[44] *See id.*

[45] We disagree with the Company's assertion at oral argument that our distinguishing *Entergy III* on this basis would violate the principle that "a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency." *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947). We uphold the Board's order on the ground that the Company failed to produce sufficient evidence that system operators possess supervisory authority—the precise ground on which the Board based its decision and distinguished *Entergy III*. Our rejection of the Company's characterization of *Entergy III* as finding assignment authority based on analogous facts merely reinforces our agreement with the Board majority that a different record here warrants a different outcome. The *Chenery* doctrine is therefore inapplicable. *Cf. Slaughter v. NLRB*, 794 F.2d 120, 128 (3d Cir. 1986).

places.[46] The parties' primary factual dispute concerns the extent to which system operators can require—rather than simply request—that crews dispatch to a particular location. The Board majority determined that the Company failed to meet its burden on this point, reasoning as follows:

> While some Employer witnesses testified that System Operators have the authority to prioritize jobs, Senior System Operator Jim Luciani's testimony disputed the assertion that System Operators have the authority to command Dispatchers, Field Supervisors, and Work Coordinators to dispatch employees to a specific location or call them back, apart from providing input as to which locations may be of higher priority. Rather, it would appear from his testimony that the Dispatchers, Field Supervisors, and Work Coordinators are tasked with handling both the regular dispatch of crews and work assignments as well as dispatch in the event of regular or multiple outages.[47]

The Board also adopted the Regional Director's factual determinations, which included a square finding that "it is the

---

[46] *See Entergy IV*, 973 F.3d at 458 n.5 ("[T]here is no categorical rule that all dispatchers must have the same supervisory status.").

[47] App. 5 n.3.

Field Supervisor who assigns employees to [their] tasks, and the System Operators do not have the authority to do so."[48]

Substantial evidence supports these determinations. Luciani testified that he lacked the authority to direct a field supervisor to send a crew to a location, stating that such authority is "above [his] level" and that at most he could "ask really nicely."[49] Two management witnesses—Michael Sullivan, a vice president for the Company's parent corporation, and Jay Davis, the system operators' supervisor— likewise acknowledged field supervisors' intervening responsibility for selecting crews for dispatch. Both the Board and the Regional Director considered evidence that system operators have the authority to cancel previously scheduled work and reasonably concluded that such evidence did not establish that system operators had the power to assign or

---

[48] App. 31. The Regional Director's discussion elsewhere of system operators' "authority to direct Field Supervisors to assign crews" only on occasions where "there is a disagreement as to whether a field crew should be assigned," does not undermine this square finding, particularly in light of his observation that the record did not contain clear evidence of "how often or in what circumstances this has occurred." App. 27. On the contrary, the Regional Director repeatedly found that the authority to assign field employees to jobs resides with field supervisors, and that field supervisors can refuse system operators' requests. The Board majority echoed this finding that the record lacked evidence of an occasion on which a system operator's recommendation to make an assignment was followed.

[49] A.R. 233-34.

reassign those employees to places, particularly when weighed against Luciani's testimony that he lacked that authority.

The Company argues that the Board ignored Luciani's responses to hypothetical questions about whether he can direct a field employee to report to Company priorities during an emergency; to one question he responded, "[s]ure, I can tell him can you go to the hospital next," and to the other he explained that he "may tell them to go."[50]  The Company also marshals conclusory testimony from Sullivan and Davis that system operators have the authority to assign a crew or to direct a field supervisor to assign a crew.  Applying deferential substantial-evidence review, we cannot conclude that these hypotheticals and conclusory statements undermine the Board's decision in light of other record evidence, including Luciani's testimony that he lacks the authority to assign or select workers for jobs, that he can only "provide input" into such decisions, and that other Company employees—namely, field supervisors and work coordinators—assign work for the field.[51]

The Company also objects to the Board's reasoning that the record lacked "clear evidence of a specific occasion when a System Operator held over crews, assigned them to a job, or made a recommendation to do so that was then followed."[52]

[50] A.R. 225, 240-41.

[51] A.R. 230, 239-40; *see Golden Crest Healthcare Ctr.*, 348 N.L.R.B. 727, 731 (2006) ("[P]urely conclusory evidence is not sufficient to establish supervisory status.").

[52] App. 5 n.3.

21

The Company correctly observes that the statutory supervisor designation turns on the existence of supervisory authority—not the frequency of its exercise.[53]  However, in *NLRB v. New Vista Nursing & Rehabilitation*, we drew a clear distinction between cases in which there are *few* examples of the exercise of supervisory authority—which does not undercut the existence of that authority—and cases in which there are *zero* examples—which does.[54]  We explained that, in the former category of cases, "whether the employees exercise their supervisory authority only a few times (or even just one time)" is insufficient to disprove supervisor status.[55]  By contrast, in cases where "'the record [does] not reveal *any instances*'" of the exercise of supervisory authority, that authority could be "merely 'a speculative possibility, which absent demonstration, is simply 'paper power.''"[56]

---

[53] *See* 29 U.S.C. § 152(11) (defining supervisor as "any individual having authority . . ."); *NLRB v. Prime Energy Ltd. P'ship*, 224 F.3d 206, 210 (3d Cir. 2000) ("[O]nce the existence of supervisory authority is established, the degree or frequency of its exercise is of little consequence." (alteration in original; quotation marks and citation omitted)).

[54] 870 F.3d 113, 131-33 (3d Cir. 2017).

[55] *Id.* at 132-33.

[56] *Id.* at 131-32 (emphasis in original) (first quoting *NLRB v. Attleboro Assocs., Ltd.*, 176 F.3d 154, 165 (3d Cir. 1999); then quoting *Beverly Enters.-Mass., Inc. v. NLRB*, 165 F.3d 960, 964 (D.C. Cir. 1999)).

The Board majority's reasoning that the record lacked evidence of *any* occasion on which a system operator exercised his purported authority to assign employees to a place and construal of the absence of such evidence against the party asserting supervisor status was therefore permissible.[57] The cases on which the Company relies are all of the former category or are otherwise inapposite.[58]

Because substantial evidence supports the Board's conclusion that system operators lack the authority to assign employees to a place under Section 2(11), we need not reach the question of whether they exercise independent judgment.[59]

---

[57] *See Beverly Enters.-Mass.*, 165 F.3d at 961 ("While the exercise of supervisory authority is not always necessary to establish that authority is possessed, the repeated failure to exercise putative authority in circumstances where such exercise would be appropriate can be evidence that the authority is more imagined than real.").

[58] *See, e.g.*, *New Vista*, 870 F.3d at 134 (holding that the Board applied the wrong legal standard where it "rel[ied] heavily on the fact that the [workers] did not frequently exercise their alleged supervisory power"); *Prime Energy*, 224 F.3d at 210 ("The mere fact that the regional director found only one instance where [the purported supervisor exercised the authority to discipline] is hardly a reasonable basis to conclude that the authority was lacking.").

[59] *See NLRB v. NSTAR Elec. Co.*, 798 F.3d 1, 21 (1st Cir. 2015) ("[I]t is only when a worker performs a listed supervisor function that we then must determine whether its exercise requires the use of 'independent judgment.'").

### b. Assignment to Times

The Company also asserts that system operators can assign employees to a time, again relying on the relationship between system operators' prioritization of projects and the assignment of field employees to those projects via the intervening decisions of field supervisors. The Regional Director found that system operators' determinations about resource allocation can affect "how long field employees are at a particular jobsite," including in ways that would constitute overtime.[60] However, system operators do not schedule shifts or assign overtime, which is the purview of field supervisors, and they "cannot require field employees to stay to finish work."[61] In affirming the Regional Director's determination that system operators do not possess supervisory assignment authority, the Board majority observed that there was no evidence of an occasion on which a system operator "held over crews."[62]

Substantial evidence supports the Board's and Regional Director's findings, including Luciani's testimony that he cannot instruct crews to work overtime nor direct a field supervisor to send a replacement crew. The Company relies on management testimony that is both conclusory and contradicted by Luciani, which is insufficient to justify remand under substantial-evidence review. The Company's other

---

[60] App. 26.

[61] App. 28.

[62] App. 5 n.3.

evidence supports the undisputed assertion that system operators can cancel work. But, as we have already explained, the conclusion that the downstream effects of system operators' prioritization decisions on field employees' schedules do not alone establish Section 2(11) assignment authority is both supported by the record and consistent with the Board's decisions in other cases.[63]

Because the Regional Director's determination that system operators cannot assign field employees to times is supported by substantial evidence, we do not address the issue of independent judgment.[64]

## 2. Responsible Direction

For oversight of other employees to constitute responsible direction, "the person directing and performing the oversight of the employee must be accountable for the performance of the task by the other, such that some adverse

---

[63] *See NSTAR*, 798 F.3d at 15-16 (affirming finding that purported supervisors lacked the authority to assign to a time where they held only the authority to sequence work and could "request, but [not] require, that field employees stay past the end of their shifts to finish a job"); *Entergy I*, 357 N.L.R.B. at 2156-57 (finding no assignment-to-time authority where witness "summarily testified that dispatchers can require field employees to remain on the job and work overtime until released, but he failed to particularize his testimony, such as by describing actual incidents"), *aff'd in relevant part*, *Entergy II*, 810 F.3d at 298.

[64] *See supra* n.59.

consequence may befall the one providing the oversight if the tasks performed by the employee are not performed properly."[65] "The putative supervisor must be at risk of suffering adverse consequences for the actual performance of others, not his own performance in overseeing others."[66]

System operators guide field employees in their performance of de-energizing equipment by preparing switching instructions, based on guidance from a manual, and confirming the steps to field employees over the phone. Once the field employee performs the steps, he "tags" the equipment to indicate that it has been de-energized.[67] System operators do not monitor the switching process firsthand; instead, on-site crew leaders oversee field employees' performance of the steps.

The Regional Director determined that system operators do not responsibly direct field employees' switching performance because, while system operators "are held accountable for their own conduct in failing to communicate properly with the field employees," there is "no evidence that the System Operators are held accountable for the field employees' performance or that they suffer adverse consequences if the field employees perform poorly."[68]

---

[65] *Mars Home*, 666 F.3d at 854 (quotation marks omitted) (quoting *Oakwood Healthcare*, 348 N.L.R.B. at 691-92).

[66] *Id.*

[67] A.R. 127, 184.

[68] App. 28, 32.

Substantial evidence supports this conclusion, and the Company's three primary evidentiary arguments are insufficient to show the accountability necessary for responsible direction.

The Company first points to an incident in which a field crew timed out of a location and a system operator failed to request that a replacement crew be dispatched, for which the system operator received a "verbal censure."[69] But this incident did not involve any mistake by a field employee and, indeed, Davis testified that the system operator received a censure because he "did not follow up with getting another crew to complete that work."[70] The evidence therefore supports the Regional Director's determination that system operators are evaluated "on their own performance," which does not support a finding of responsible direction.[71]

---

[69] App. 28; A.R. 190.

[70] A.R. 189.

[71] App. 32; *see Mars Home*, 666 F.3d at 854 (affirming finding of no responsible direction where purported supervisors were "disciplined for their own failings"); *NSTAR*, 798 F.3d at 18 (affirming finding that purported supervisor did not responsibly direct field employees where he was held accountable "for how he did his own work and not for how the field employee did his"); *Entergy II*, 810 F.3d at 296 ("[S]ubstantial evidence supports the Board's determination that dispatchers are accountable only for their own mistakes[, a]nd under *Oakwood*, this is sufficient to show that dispatchers do not 'responsibly direct' field employees.").

27

A second incident involved a field employee who discovered an equipment failure and, after troubleshooting, proceeded with the switching process without contacting the system operator. The incident resulted in a change to the switching instructions to include a step requiring additional equipment readings. This example lacks the prospect of "actual accountability" required for responsible direction, as there is no evidence, including in the incident report and in Davis's testimony, of any consequences for system operators other than coaching on the revised instructions.[72]

Third, the Company relies on evidence that system operators' performance evaluations account for a companywide goal of fewer than twenty-five permit-and-tag ("P&T") errors in the switching process—an overall performance standard that affects the unit collectively. The evaluation forms show that system operators have a team safety goal of "[l]ess than 25 regional P&T incidents" as well as an individual goal of "no incidents due to System Operator Error."[73] One evaluation form shows that the team P&T goal was not met, but there is no indication that the system operator was disciplined in any way for the performance of a field employee under his direction. Davis testified only summarily that "if the field . . . is not performing well, the system operators take a hit on their evaluations."[74] The inclusion of a

---

[72] *Golden Crest*, 348 N.L.R.B. at 731 (requiring, for responsible direction, "evidence of actual or prospective consequences to . . . terms and conditions of employment").

[73] A.R. 521.

[74] A.R. 186.

team goal accounting for other employees' performances does not establish that system operators in fact face the prospect of adverse consequences, as is required for responsible direction.[75] Substantial evidence therefore supports the Regional Director's conclusion that system operators do not responsibly direct field employees.[76]

---

[75] *See NSTAR*, 798 F.3d at 19 (affirming finding that employer failed to show that purported supervisors' bonuses, which reflected "the manner in which they have managed projects in the field[,] . . . suffice[d] to make [their] direction of field employees into 'responsible' direction" (internal quotation marks omitted)). For this reason, the Regional Director's arguably erroneous statement that field employees' "performance standard of fewer than 25 errors . . . does not apply to System Operators" does not undermine his ultimate finding that "there is no evidence that System Operators are *held accountable for* those errors." App. 32 (emphasis added). Remand on this factual finding alone "would be an idle and useless formality." *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6 (1969).

[76] The Company also repurposes its assignment claim to argue that system operators' prioritization of field needs, such as when there are multiple outages, constitutes responsible direction. The Company relies on *W. Penn Power Co. v. NLRB*, 337 F.2d 993 (3d Cir. 1964), which predated the Board's *Oakwood Healthcare* decision providing the operative interpretation of "responsibly to direct" and which relied heavily on the purported supervisors' job description, a factor that is no longer of controlling importance under *Oakwood*. *See Oakwood Healthcare*, 348 N.L.R.B. at 690 n.24 ("[J]ob titles and descriptions prepared by employers are not

Even assuming system operators responsibly directed field employees' performance of switching steps, substantial evidence supports the Board's conclusion that the Company failed to show that "writing switching instructions constitutes independent judgment," since "these instructions are guided by a manual and are ordered by safety concerns."[77] An individual exercises independent judgment "when he acts or recommends action 'free of the control of others and form[s] an opinion or evaluation by discerning and comparing data.'"[78] "[A] judgment is not independent if it is dictated or controlled by detailed instructions" that do not "allow for discretionary choices."[79] Luciani testified that Company manuals circumscribe switching steps for de-energizing equipment, and system operators effectively translate those steps into an instruction format. The Company produces no evidence undermining this testimony. Because these manuals dictate the

controlling; rather the Board looks to the authority actually possessed and the work actually performed by the alleged supervisor."); *see also NSTAR*, 798 F.3d at 11 n.8 (rejecting employer's reliance on pre-*Oakwood* cases). The Company's argument that dispatchers' job descriptions state that they are under the direction of system operators suffers from the same failing, particularly in light of evidence that system operators lack actual authority to direct dispatchers regarding field employees' assignments.

[77] App. 5 n.3.

[78] *Mars Home*, 666 F.3d at 854 (alteration in original) (quoting *Oakwood Healthcare*, 348 N.L.R.B. at 692-93).

[79] *Oakwood Healthcare*, 348 N.L.R.B. at 693.

ordering of switching steps, the Board permissibly concluded that system operators' purported direction of field employees in this task does not require independent judgment.

## IV.

We have considered the Company's remaining arguments and find them without merit. Because the Board's determination that the system operators are not supervisors within the meaning of the Act is supported by substantial evidence, we will deny the Company's petition for review and grant the Board's cross-application for enforcement.